700 So.2d 1207 (1997)
James Wayne HAZEN, Appellant,
v.
STATE of Florida, Appellee.
No. 84645.
Supreme Court of Florida.
September 4, 1997.
Rehearing Denied October 29, 1997.
Lynn A. Williams, Tallahassee, for appellant.
Robert A. Butterworth, Attorney General; Richard B. Martell, Chief, Capital Appeals; and Gypsy Bailey and Carolyn M. Snurkowski, Assistant Attorneys General, Tallahassee, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon James Wayne Hazen. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Hazen's convictions for one count of first-degree felony murder, three counts of armed sexual battery, one count of burglary of a dwelling with an assault and intent to commit theft, and one count of armed robbery. We vacate his sentence of death, however, and remand to the trial judge with directions to impose a life sentence.

FACTS
The record reflects the following. The victim, Gary McAdams, was killed by a contact gunshot wound to the head in the early morning hours of July 11, 1993. This means that the barrel of the gun was pressed tightly against the skin. Mr. McAdams was probably rendered brain dead immediately.
On the night of his demise, Mr. McAdams and his wife, Cecilia, attended a high school reunion. They returned home after midnight. Once inside the house, they heard a knock at the door. When they opened the door, Curtis Buffkin pointed a gun at them and entered their home. He ordered the couple to get down on the floor and keep their heads down. James Hazen and Johnny Kormondy then entered the house. The blinds were closed and the phone lines disconnected.
At this point, two of the intruders took Mrs. McAdams to her bedroom and forced her to remove her green silk dress. She was then sexually assaulted orally by one of the intruders while she was raped by the second intruder. The two intruders bragged as they sexually assaulted Mrs. McAdams. After the assaults, she was taken back, still naked, to the kitchen. Mr. McAdams was then told to drink a beer that had been slammed down *1208 between him and his wife. He drank some of the beer.
Mrs. McAdams was then taken to the bedroom again. The third intruder told her, "I don't know what the other two did to you, but you're going to like what I'm going to do." He proceeded to rape her. While she was being raped by the third intruder, she heard a gunshot from the kitchen area.[1] She screamed her husband's name and received no response. The third intruder jumped up and threw a towel over Mrs. McAdams' head. A gunshot then went off in the bedroom. She ran out to the kitchen and found blood about her husband's head.
Hazen, Kormondy, and Buffkin were indicted on July 27, 1994. Each was ultimately tried separately. Buffkin accepted a plea bargain by the State. He pled guilty to first-degree murder and received a life sentence in exchange for testifying for the State, as needed, in the other prosecutions. By so pleading, Buffkin avoided the possibility of a death sentence.
Hazen's trial commenced on August 24, 1994, and concluded on August 27, 1994. Buffkin was a primary witness in this trial. Hazen was found guilty of first-degree murder, three counts of sexual battery with the use of a deadly weapon or physical force, burglary of a dwelling with an assault or while armed, and robbery while armed. The jury reconvened on August 29, 1994, and a penalty-phase proceeding was held. The jury recommended that the death sentence be imposed by a margin of seven to five. The trial judge imposed the death sentence on October 7, 1994.
In his sentencing order, the trial judge found three statutory aggravating factors: (1) the defendant had been previously convicted of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged, or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit a burglary; and (3) the capital felony was committed for pecuniary gain. While considering numerous statutory mitigating circumstances, only one was found to be established. The trial court found that although Hazen was twenty-one years of age at the time of the crime, "he was emotionally dependent, a follower, unable to manage his own financial affairs and generally inept in meaningful decision making." The trial judge found that the statutory mitigating circumstance of age was established and accorded this circumstance moderate weight.
The judge then considered six nonstatutory mitigating factors. First, he found that Hazen had experienced an unstable childhood. Although established, he gave this factor little weight. Second, he rejected Hazen's proposal that he had not committed prior violent crimes. Instead, the trial judge found that Hazen's own testimony demonstrated his violent propensity. Third, the trial judge gave moderate weight to the fact that Hazen had received his GED, obtained early release, and made efforts to rehabilitate his life during and after his term in an Oklahoma prison. Fourth, the trial judge rejected the suggestion that Buffkin's life sentence should be mitigation in Hazen's case. He wrote:
The rule of law precluding disparate treatment of equally culpable non-triggerman co-defendants is inapplicable when (as in this case) the state elects not to pursue the death penalty against one co-defendant in exchange for testimony establishing the identity and participation of the other. Under these circumstances any resulting difference in the severity of sentence arises from a tactical choice made by the prosecuting authority and not by the exercise of independent discretion by either the jury or sentencing judge.
*1209 Fifth, the trial judge rejected the notion that the failure to eliminate Mrs. McAdams mitigates the murder of Mr. McAdams. Sixth, the trial judge gave little weight to Hazen's acceptable behavior at trial.
After weighing all of the aggravating and mitigating circumstances, the trial judge imposed the sentence of death. This appeal ensues.

GUILT PHASE
Hazen raises one guilt-phase issue in this appeal. He claims that he was denied a fair trial, in contravention of article I, section 16, of the Florida Constitution and Amendments V and XIV of the United States Constitution, when a pretrial "reverse identification" episode involving Mrs. McAdams and Hazen was used to put him at the scene of the crime. The facts underlying this claim are as follows. At a hearing subsequent to the crime but prior to trial, Mrs. McAdams was able to identify Kormondy and Buffkin. She was unable to say, though, that she remembered Hazen from the criminal episode at her home. Instead, she noticed only that Hazen was staring at her throughout the court hearing. Basically, Hazen argues, this was used as a "reverse identification" during his trial. He claims that "while [Mrs.] McAdams could not recognize the third perpetrator, that third perpetrator had to be appellant because of the way he kept looking at her in court." During trial, Hazen's attorney moved in limine to preclude Mrs. McAdams from making any statements as to Hazen's alleged staring during the pre-trial hearing. The following exchange took place at the bench.
MR. ALLBRITTON: Your honor, at this time I would move in limine that this witness be precluded from making any statements in regards to identifying my client based upon having seen him in court previously. I don't know if the State is going to get into that.
MR. EDGAR: Yeah. Yeah.
THE COURT: She's going to be able to say that she has seen him before and she's seen him in court before and recognizes him from being in court?
MR. EDGAR: But not at the house.
THE COURT: But not at the house. I don't know that that's particularly harmful.
MR. ALLBRITTON: I don't know whether it's relevant. The jury may conclude that that is some type of identification. I think in abundance of caution, there's no need for it.
THE COURT: I'm not going to preclude the State from doing that provided it's absolutely clear in your questioning that the identification was such that it was, that she recognizes him from other court appearances pertaining to this case.
MR. EDGAR: Right. Right.
THE COURT: As long as it's clear. If it doesn't come across as being clear, I think that's legitimate inquiry.
MR. EDGAR: You're objecting to her identifying him?
MR. ALLBRITTON: Okay.
MR. EDGAR: I'll make it real clear.
MR. ALLBRITTON: All right.
After the above exchange, Mrs. McAdams proceeded to testify. When the matter of the pre-trial hearing arose, she testified:
Q [MR. EDGAR]: Did there come a time, some weeks after, soon after the crimes against you and your husband in your house that you went to court when three defendants appeared in court for an appearance with their attorneys?
A [MRS. McADAMS]: Yes, sir.
Q: When that occurred, did you see the individual that we identified for the record as Curtis Buffkin?
A: Yes, sir, I did.
Q: Did you immediately recognize him?
A: Yes, sir.
Q: Did you see the individual in the other photograph I showed you with the long scraggly hair or anybody who looked like him?
A: Yes, sir.
Q: Now Mrs. McAdams at this time was this particular court proceeding, was it in this building?
A: Not in this room, no, sir, in I think 401.
Q: Courtroom 401?

*1210 A: Uh-huh.
Q: When you were there, do you remember where you were seated in Courtroom 401? It's a little differently configured [than] this?
A: We were sitting behind there.
Q: Where the table would be?
A: Uh-huh.
Q: Where the prosecutor would sit?
A: Yes, sir.
Q: There's a jury over here where the Defense is sitting now?
A: Yes, sir.
Q: And the Defense sits somewhere over here on the side?
A: Yes, sir.
Q: Now the Judge, it would be where the Judge is there?
A: Yes, sir.
Q: It's a much bigger courtroom?
A: Yes, sir.
Q: You would be sitting back here?
A: Yes, sir.
Q: Was it crowded that day?
A: Yes, sir, it was.
Q: Was it basically, was there standing room only?
A: Yes, sir.
Q: Now while you were seated in the courtroom, did anybody who you did not recognize, someone who you didn't apparently believe you knew, anybody look strange at you?
A: Yes, sir, they did.
Q: If you see that person in the courtroom today would you point to them and speak their name as you know their name?
A: James Hazen.
MR. EDGAR: Your Honor, I would like the record to reflect the witness identified this defendant as the person she saw in court on this case.
THE WITNESS: Yes, sir.
THE COURT: The record will so reflect.
Q: (By Mr. Edgar) Would you tell the jurors what you noticed about him noticing you?
A: Okay, I was sitting there in the seat and this person kept looking at me but not really willing to make eye contact with me. Whenever I would catch him looking at me, he would look away and it was more of a worried look or a
MR. ALLBRITTON: Your Honor, I'm going to object. That calls for speculation on the part of this witness.
THE COURT: She can describe what she observed. You may want to rephrase the question so she can characterize it in some other fashion.
Q: (By Mr. Edgar) Let me ask this, you work in a bank?
A: Yes, sir.
Q: You deal with people every day?
A: Yes, sir.
Q: Many, many people coming in and out?
A: Yes, sir.
Q: You are familiar with people in the public that don't know you?
A: Yes, sir.
Q: That may not have ever seen you before?
A: Yes, sir.
Q: You have a pretty good idea when somebody is looking at you because you might be attractive.
MR. ALLBRITTON: Your Honor, I'm going to object to the leading form of the question.
THE COURT: Sustained as to the leading form of the question.
Q: (By Mr. Edgar) Would you characterize in your description this defendant's manner in which he looked at you in court?
A: He was, he appeared uncomfortable. He was unwilling to make eye contact with me. Whenever I looked at him because I could see that he was looking at me, he would look away. I would look away and then I would catch him looking at me again and it was a worried, uncomfortable look.
Q: Was it a flirtatious look?
No, sir, it was not.
You're sure that he wasn't looking at somebody over here or over there?

*1211 A: I'm sure.
Q: And at the time did you think you knew this person?
A: No, sir.
Q: Did you wonder about that?
A: Yes, sir.
Q: Later during that same court proceeding while you were sitting there, did they call that person's name, this defendant's name?
A: Yes, sir, they did.
Q: And you heard the name?
A: Yes, sir.
Q: And then you realized the connection?
A: Yes, sir.
It was then explicitly clarified, on cross-examination, that Mrs. McAdams did not recognize Hazen from the criminal episode at her home. We need not reach the merits of this claim. The issue is procedurally barred for lack of a contemporaneous objection. See Lindsey v. State, 636 So.2d 1327, 1328 (Fla. 1994); Correll v. State, 523 So.2d 562, 566 (Fla.1988). In any event, any error would be harmless beyond a reasonable doubt in light of significant testimony from both Buffkin and Valerie Kormondy indicating that Hazen was involved with these criminal episodes.
Further, we have reviewed the record and determined that it sufficiently supports Hazen's convictions in this case. Accordingly, we affirm all of Hazen's convictions.

PENALTY PHASE
Hazen next raises four penalty-phase issues. He argues that (1) the trial court erred in its treatment of the mitigation offered in this case; (2) the trial court erred by imposing a disproportional sentence; (3) the trial court erred in advising the jury that all jurors must vote in the penalty-phase proceeding; and (4) the trial court erred in allowing a fundamentally unfair cross-examination of Hazen's mitigation witness. Insofar as we agree that the sentence of death is disproportional in this case, we need not reach the other three issues. We find that Hazen's death sentence is disproportional because he was less culpable than Buffkin and Buffkin received a life sentence in a plea bargain. We have stated: "We pride ourselves in a system of justice that requires equality before the law. Defendants should not be treated differently upon the same or similar facts. When the facts are the same, the law should be the same." Slater v. State, 316 So.2d 539, 542 (Fla.1975). After reviewing the record, it becomes clear that Buffkin was more culpable than Hazen. The question then arises as to why the State agreed to let Buffkin enter a plea in exchange for a life sentence. The State explained its position, in part, as follows:
Your Honor, I would like to point out, first of all, that the State's position in this case from the beginning, our office's position and my position, has been that all three of these defendants should receive the death penalty.
....
... [T]he case for the State was basically this. We had eyewitness identification and scientific testing to put Mr. Buffkin at the scene in addition to other evidence. We had a confession and fiber evidence that would put Mr. Kormondy at the scene. We had, basically, the circumstantial evidence and the testimony of Mr. Buffkin to put Mr. Hazen at the scene.
Without the testimony of Mr. Buffkin, we had circumstantial evidence. Maybe the State would have proved this case, likely we could have, but to be sure, the State realized to be sure with Mr. Buffkin, it was necessary to testify. Somebody would have to testify.
Now, who was it going to be? Would the State bargain the triggerman away? The State was firmly convinced, the jury was firmly convinced, and any reasonable person was firmly convinced that Mr. Kormondy was the triggerman.
....
The State wished to get the death sentence for all three men, because the aggravators outweigh the mitigators in each and every case. But the State could not do so and the State made a bargain, not because the State felt that a nontriggerman in this casein this circumstance didn't deserve the death penalty, but because the State *1212 felt that if somebody was going to testify against Mr. Hazen, it would not be as a matter of judgment on my part the triggerman. The lesser of two evils would be the nontriggerman.
In essence, the State made the strategic decision to give Buffkin a life sentence in exchange for testimony putting Hazen at the scene of the crime. In that respect, Buffkin was a crucial witness. With that in mind, we turn to Buffkin's account of the crime.
Q: (By Mr. Edgar) Mr. Buffkin, in the hours preceding your entry into the McAdams' home, were you staying and were you at the home of Johnny Shane Kormondy?
A: Yes, sir.
....
Q: How long had you been staying at his home?
A: It was the 8th day when I got to his house.
Q: The 8th of July?
A: Yes, sir.
Q: Were you escaped from the road camp?
A: Well, I escaped on the 6th.
Q: Had you known Mr. Kormondy before?
A: Yes, sir, I had.
Q: During the time you stayed with Mr. Kormondy did you and Mr. Kormondy break into a house off Nine Mile Road or near Nine Mile Road?
A: Yes, sir.
Q: Did you steal anything?
A: We stole jewelry and money and a gun.
....
Q: After you stole this weapon and prior to your going to the McAdams' residence, did you and Mr. Kormondy talk about breaking in a house and robbing people inside?
A: Yes, sir.
Q: When and where did that or those conversations take place?
A: They took place first at his house in the kitchen.
Q: What was said?
A: Well, we both mentioned about hitting a house up with someone in it because you get more money.
....
Q: Now, after you discussed the robbery with someone at home with Mr. Kormondy, did you have an occasion to also meet up with a Mr. Hazen, the defendant, in this case?
A: I meet with Mr. Hazen when they came back from a reunion.
Q: Was that before or after you had the conversation in the kitchen with Mr. Kormondy about breaking into a house?
A: That waswell, me and Kormondy had stated that way before he had came to the house and then we mentioned it again after he was in the living room when they had some company over there.
....
Q: Now, when you left to go riding around, where did y'all go?
A: We just started riding. We left out. We went out towards, from, I think Mrs. Kormondy's mother owned this bait and tackle place right there on Pine Forest Road, we jumped on Pine Forest and started heading out towards Nine Mile Road. You got like the Groovin Noovin Store here and I think a 7-Eleven store and then you have a bank over this way. We took a right going out towards the Food World way and me and Kormondy started talking about hitting a house and we were going out towards this place where him and his brother used to live at one time and we wound up going back to that same subdivision that me and him and a dude named Joe had went one other time before and we pulled up around where that subdivision was and we were fixing to head back out and a car had come down that road and was fixing to turn, I think right there on that corner there and Kormondy stated that's us right there, right when we seen the car.
I knew what time it was already. I knew we were fixing to go ahead and hit a house. I don't know if Hazen heard it or *1213 whatever, if he knew, if he even knew what was going on.
....
Q: And then what happened?
A: And we wound up going down there, got right there where that car had pulled up in there and I ain't for sure if that was the right car that pulled up in the garage or not because I wasn't for sure.
Q: Was the garage door open?
A: It was opened, yes, sir.
....
Q: So you saw a man in the garage go in the house?
A: Yes, sir.
Q: Okay.
A: And I wound up walking up towards that driveway and going up towards the garage and they started to come right on up behind me and I got up there by the door, Kormondy walked up right beside me and he was putting his shirt around his head, a T-shirt and he was standing off to the side from where the door was and Kormondyand Hazen was outside the door right where the garage door is. He was standing right there and he was looking and so I tapped on the door.
....
Q: So you knocked on the door?
A: Yes, sir.
Q: Then what happened?
A: I heard someone say who is it and I like, I said me and he said who is it and I said, me and he wound up opening the door and I seen a man and woman standing there and I looked at them and I said, I said put your heads down and don't look up or I'll blow your fucking head off.
Q: Did you show them the gun?
A: Yes, sir.
....
Q: What, if any, plan did you have to secure the house inside once you got in?
A: Well, me and Kormondy had talked about it before and I just basically told him when we enter the house just pull the phone cords and shut the curtains and stuff like that and so that's basically what happened. When he came in he ran towards where like you come in the door here, you have got the kitchen here, you have got like a little bar thing here. He ran around that way, snatched out the phone and started shutting the blinds. When Hazen came in the door, he went off towards like where the living room part was and after he got through they started heading down towards the bedroom in the house. I don't know what they were doing back there.
....
[Buffkin later went to the back with Mrs. McAdams.]
[BUFFKIN]: About that time, Hazen come back there after Kormondy went up front and he tried to hand me the gun, the one that I handed him which was the .44 and I told him no. I told him to keep it is basically what I was telling him and I was shaking my head. I told him no, go ahead, you keep it with you.
Q: Did you say that or just shake your head?
A: I was just shaking my head telling him, just telling him to keep it on him. So I got up off the woman. I guessI don't know if he got on the woman or what. I think he did but I had got off the woman, the towel was over the woman's head and I ran in there in the living room back up where the kitchen was and I was right there at the bar. I don't know what they was back there doing because I wasn't back there. So I'm by the little bar looking through the woman's purse and stuff, seeing if she had any money in her purse and about this time I looked over and Kormondy was sitting there telling him, saying keep your fucking head down is basically what he told the man.
So I'm looking at him. About this time I hear a hammer pulled back and I figured, I said uh, I know how guns are, I know they are easy to go off because my daddy had done told me before how they are, how guns are. When I heard that hammer pulled back, I looked over there and I shook my head and I was telling him no, is basically what I was telling him about the hammer being pulled back.

*1214 So he bumped the man on the head again. He started telling him he said keep your motherfucking head down is basically what he was telling him.
Q: Was the man doing what he was saying?
A: The man was doing exactly what he said. He was cooperating. He just basically told the man, keep your fucking head down is basically what he told him. And he kept bumping the man on the head and about that time the gun went off and I seen the man's body weight just like drop and he fell back and went to snorting like and I figure, damn, the man done got shot. About that time Kormondy opened the door that we had first entered in where the garage is, he ran outside the door and he wound up coming back in.
....
Q: Then what happened?
A: So he went outside the door there and wound up coming back in. After I heard the second shot back there in the back. I figured, damn, the woman just got shot too. I figure it's about time for me to get the hell up out of here. So I shot up out the door, I don't know what they are doing back there. I started heading across people's yard going back towards the road there I headed down towards where the vehicle was and before I got to the vehicle right there at the corner I seen a car come down the road so I stopped, ran over to the other way until the car passed by and then I went back over towards where the car was and they had started running down there towards where I was and we got in the car and all and Kormondy stated he say, he looks at me and he hands me the gun that belongs to the man. He says, I didn't mean to shoot the man is what he said, it happened on accident. And I looked at him and I said, well, what is done is done, you can't change it now. And I fired me up a cigarette and he fired up the vehicle and we rode off.
It is clear from Buffkin's own testimony that he and Kormondy were the instigators of this criminal episode. Further, the trial judge expressly found that Hazen was a "follower." Under these facts, Buffkin was assuredly more culpable than Hazen. Indeed, Buffkin was not sure "if [Hazen] even knew what was going on." At the McAdams' home, Buffkin carried the gun, tapped on the door, and was the first to enter the home. Hazen, on the other hand, was the last to enter the home.
Once inside the home, the events proceeded as "[Buffkin] and Kormondy had talked about it." Specifically, "[Buffkin] just basically told [Kormondy] when we enter the house just pull the phone cords and shut the curtains and stuff like that and so that's basically what happened." Finally, Buffkin admits that he was near Kormondy when the fatal shot was fired. Therefore, he was in a far better position than was Hazen to prevent the shooting. In sum, it is simply impossible to say that Hazen was as culpable as Buffkin.
In Witt v. State, 342 So.2d 497, 500 (Fla. 1977), we made clear that a codefendant's life sentence was a factor that had to be considered when sentencing Witt. There, though, we proceeded to allow disparate sentences for appellant Witt and codefendant Tillman. We explained that "five psychiatrists who examined Tillman indicated Tillman had a severe mental or emotional disturbance and was subject to domination by Witt. Witt's dominance was enhanced by his age of thirty years, compared to Tillman's age of eighteen." Id. at 501. Tillman was the follower and Witt was the leader. We found no obstacle to Witt receiving the death penalty and Tillman receiving a life sentence because Witt clearly dominated the criminal episode. Hazen, though, did not play a dominant role in this case. In fact, the evidence clearly establishes that Buffkin was a prime instigator and was more culpable than Hazen. In Slater, we held that the less culpable, non-triggerman defendant cannot receive a death sentence when the more culpable, triggerman defendant receives a life sentence. Slater, 316 So.2d at 542. We find that this reasoning holds true even when two non-triggermen are involved if one of the defendants is a prime instigator and the other is not. Therefore, Buffkin's life sentence precludes a death sentence for Hazen.
*1215 Accordingly, for the reasons explained, we affirm Hazen's convictions for first-degree felony murder, three counts of armed sexual battery, one count of burglary of a dwelling with an assault and intent to commit theft, and one count of armed robbery. We note that Hazen was sentenced to a life sentence for each of the five non-murder convictions. Each of the five sentences is to run consecutively. Also, each life sentence carries a three-year minimum mandatory imprisonment that will "run concurrently with each count." We must vacate, however, Hazen's sentence of death and remand with instructions that the trial court enter a life sentence for Hazen's conviction of first-degree felony murder without possibility of parole for twenty-five years. Each of Hazen's other five consecutive life sentences will run consecutive to this sentence.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and ANSTEAD, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Justice, concurring in part and dissenting in part.
I concur in the decision affirming the guilt convictions. I dissent as to the setting aside of the sentence of death. I would affirm the death sentence for Hazen, whom the record clearly shows was a major participant in this horrid criminal episode and who by his conduct demonstrated the reckless indifference to human life which makes the imposition of the death penalty appropriate.
As to Hazen's major participation, I believe Ms. McAdams' testimony clearly establishes that all three men joined with equal fervor in the inhumane abuse of her and her murdered husband in their home. The facts do not support the majority's minimizing of any of their roles. The home invasion, armed robbery, and murder of Mr. McAdams were an obvious joint venture. While I agree that the episode may have begun through the collaboration of Buffkin and Kormondy, Hazen, upon becoming aware of what the others were doing, became a full joint-venturer. Importantly, the record establishes that it was Hazen who engaged in the torturous rape of Ms. McAdams after locating the murder weapon while ransacking the home.
Hazen was not some kind of intimidated, following stooge. Hazen on his own initiative put the shirt over his own head. Hazen put the socks over his own hands. Hazen ripped telephone cords from the wall. Hazen ransacked the house. Hazen took a gun in his own hands. Hazen used his own penis in assaulting Ms. McAdams. Hazen used his own eyes to witness the other participants' battering of Ms. McAdams. Hazen used his own silence and neither dissuaded nor disavowed the other joint venturers from the rapes, the robberies, or the murder; neither did he attempt in any way to do so. If a nontrigger person is eligible for the death penalty under our law, there should be no question as to Hazen's eligibility for that penalty, for clearly what he joint-ventured was a death qualifying and death deserving crime.
This Court's cases have clearly held that a nontrigger person who is a major participant in a felony murder and whose conduct demonstrates the kind of reckless indifference to human life demonstrated by Hazen is death qualified. I find what the Court stated in DuBoise v. State, 520 So.2d 260, 265-66 (Fla. 1988), to be directly on point:
DuBoise claims that death is a disproportionate punishment for felony murder, and therefore, that his death sentence violates Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). We disagree. We have upheld the death penalty in numerous cases where, as here, the appellant did not actually commit the subject homicide. E.g., Copeland v. Wainwright, 505 So.2d 425 (Fla.1987); Jackson v. State, 502 So.2d 409 (Fla.1986); Cave v. State, 476 So.2d 180 (Fla.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); State v. White, 470 So.2d 1377 (Fla.1985); Bush v. State, 461 So.2d 936 (Fla.1984), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986); James v. State, 453 So.2d 786 (Fla.), cert. denied, 469 U.S. 1098, 105 S.Ct. 608, 83 L.Ed.2d 717 (1984); Ruffin v. *1216 State, 420 So.2d 591 (Fla.1982). Moreover, the United States Supreme Court recently clarified Enmund in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).
In Tison the Court stated that Enmund covered two types of cases that occur at opposite ends of the felony-murder spectrum, i.e., "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have any culpable mental state" and "the felony murderer who actually killed, attempted to kill, or intended to kill." 481 U.S. at 150, 107 S.Ct. at 1684. The Tison brothers, however, presented "the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life." Id. at 152, 107 S.Ct. at 1685. The Court recognized that the majority of American jurisdictions which provide for capital punishment "specifically authorize the death penalty in a felony-murder case where, though the defendant's mental state fell short of intent to kill, the defendant was a major actor in a felony in which he knew death was highly likely to occur," id. at 154, 107 S.Ct. at 1686, and that "substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an `intent to kill.'" Id. Commenting that focusing narrowly on the question of intent to kill is an unsatisfactory method of determining culpability, the Court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id. at 158, 107 S.Ct. at 1688 (footnote omitted).

Tison is applicable to this case because it does not present either of the extremes covered by Enmund; DuBoise was more than a minor actor in the felonies involved here, but he did not actually kill the victim. Therefore, we must determine if DuBoise was a major participant in felonies committed with a reckless indifference to human life which culminated with the victim's death. We find that DuBoise meets these criteria.
....
DuBoise was a major participant in the robbery and sexual battery. He made no effort to interfere with his companions' killing the victim. By his conduct during the entire episode, we find that he exhibited the reckless indifference to human life required by Tison. We hold, therefore, that there were no constitutional impediments to sentencing DuBoise to death.
I find absolutely no reason not to apply this analysis to Hazen. In sum, the facts do not support that Hazen was less a participant in the actual crimes than Buffkin.
Moreover, I do not understand the logic of the majority's holding that because the state attorney found it necessary to make a plea deal with Buffkin, that should advantage Hazen. The majority's decision puts the State in the untenable Catch-22 of either not obtaining a conviction or of doing what is determined by the state attorney to be necessary to obtain the conviction of the defendant but thereby insulating the defendant from the death penalty. In essence, defendant's legal dodge of hiding his identity is a success because this Court puts the state attorney in that dilemma. This is plainly and categorically wrong. This Court recognized this in Witt v. State, 342 So.2d 497 (Fla.1977), in which the Court approved the death sentence even though a codefendant had been allowed to plead and received a life sentence. The majority's attempt to distinguish Witt does not withstand the test of the record here.
I believe this Court should recognize the obvious difference between proportionality review when there is a jury's determination that one of the participants in a criminal episode should be sentenced to life and when the State accepts a plea from one of the defendants in exchange for trial testimony adverse to the other defendant. Proportionality should be judged on the basis of the facts of the criminal episode, not on the basis of how bringing the participants to justice must be practically accomplished.
NOTES
[1] Hazen, in this case, and Kormondy, in case No. 84,709, present different factual scenarios. Neither record is entirely clear as to the relative locations of Hazen and Buffkin at the time of the fatal shot. The recitation of facts in Kormondy's brief indicates that Buffkin was in the back room when the fatal shot was fired. Kormondy himself, however, claims that Buffkin fired the fatal shot. Such a claim puts Hazen in the back room. In Kormondy's trial, Mrs. McAdams identified Buffkin as the rapist in the back room when the fatal shot was fired. In Hazen's trial, she was not so specific. Hazen argues that he was in the back room when the fatal shot was fired.