701 So.2d 858 (1997)
Martin PUCCIO, Appellant,
v.
STATE of Florida, Appellee.
No. 86242.
Supreme Court of Florida.
November 20, 1997.
*859 Richard L. Jorandby, Public Defender and Paul E. Petillo, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General and Sara D. Baggett, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Martin Puccio. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Martin Puccio and Bobby Kent had known each other since third grade, had lived on the same block in Broward County since that time, and were good friends as adults. Bad blood, however, existed between the two. Puccio felt "ill-will and hatred" towards Kent because Kent would bully and pummel him. For a few weeks prior to the murder, Kent dated Alice Willis, best friend of Puccio's girlfriend, Lisa Connelly, and when Willis moved back with her parents in Palm Bay, Florida, Kent said he was going to murder her and smother her baby unless she returned to Broward County to date him. Willis returned and she and Connelly concocted a plan to kill Kent. The women obtained a gun and lured Kent to a rock pit in west Broward but backed out at the last minute. Later that night, Kent and Willis were seen holding hands but then, according to Willis, Kent raped her at her house. The next day, July 15, 1993, a wider circle of friends conspired to kill Kent and again lured him to the rock pit. The following were present: Alice Willis, Donald Semenec, Heather Swallers, Lisa Connelly, Martin Puccio, Derek Dzvirko, and Derek Kaufman. While Willis and Swallers distracted Kent, Semenec stabbed him from behind. Puccio then stabbed him in the abdomen, and when Kent tried to flee, Semenec, Kaufman, and Puccio tackled him and stabbed and beat him. Kaufman delivered the final blow with a weighted baseball bat, and he and Puccio threw the body into a canal.
Puccio was charged with first-degree murder and conspiracy to commit murder and was found guilty as charged.[1] During the penalty phase, relatives, friends, acquaintances, and a mental health expert testified in mitigation. (Puccio's mother testified inter alia that he was a loving child, affectionately called "our little Lover Bug.") The jury recommended death by an eight-to-four vote, and the judge imposed a sentence of death based on two aggravating circumstances,[2] two statutory mitigating circumstances,[3] and several nonstatutory mitigating circumstances.[4]
*860 Puccio raises twenty issues on appeal,[5] but we find a single claim dispositive. Puccio claims that the trial court erred in imposing death when other equally culpable co-perpetrators were sentenced to lesser punishments. We agree. A trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence. See generally Scott v. Dugger, 604 So.2d 465 (Fla.1992) (relying on the factual statements of the trial judge concerning the relative culpability of the co-perpetrators). Our review of the present record, however, shows that the trial court's determination is not supported by competent substantial evidence.
The trial court noted at various points in its sentencing order that Puccio was more culpable than the other co-perpetrators:
In contrasting the relative culpability of each defendant indicted for the murder of Bobby Kent, Martin is extremely culpable, relative to the others charged.
....
... Of all the defendants charged with the murder, this defendant was clearly the most responsible.
....
... However, Martin Puccio's actions and involvement in the murder of Bobby Kent are far greater, and give rise to the superior level of culpability than any of the other co-defendants.
....
... Martin Puccio has a greater level of culpability compared to the other co-defendants.
....
... Martin Puccio's acts create a significantly higher level of culpability than the acts of his co-defendants....
Martin Puccio has a greater level of culpability than any of the other co-defendants.
....
The culpability of the defendants charged in the death of Bobby Kent are not equal. Bobby Kent's death was primarily the result of Martin Puccio's actions.... Contrasting the relative culpability of each defendant indicted for the murder of Bobby Kent, Martin Puccio is significantly more culpable.
The above statements were based entirely on the trial court's findings of fact. Our reading of the sentencing order, however, reveals that Puccio played no greater a role in the planning and killing of Kent than several of the other co-perpetrators and, in fact, a lesser role than some. The trial court made the following findings of fact in its sentencing order:
1. The defendant and six other young adults/juveniles were charged with the murder and conspiracy to commit murder of Bobby Kent which occurred on July 15, 1993.
2. Martin Puccio resided on the same block as the victim, Bobby Kent. They had been best friends since third grade.
3. Lisa Connelly, at the time of the murder, was Martin Puccio's girlfriend and was pregnant with his baby.
4. Alice Willis was best friends with Lisa Connelly. Shortly after Connelly began to date Martin Puccio, Connelly introduced Bobby Kent to Alice Willis. Kent and Willis subsequently began to date. Their relationship lasted for a few weeks. Afterwards, Alice Willis moved back to Palm Bay, Florida, to reside with her parents. 5. On July 13, 1993, Lisa Connelly telephoned Alice Willis in Palm Bay. Willis was told that Bobby Kent was planning to come to Palm Bay to murder her (Willis) *861 and smother her baby, unless she returned to Broward County to date him again.
6. Shortly after this discussion, Alice Willis, Donald Semenec and Heather Swallers arrived at Connelly's house from Palm Bay, Florida. They all proceeded to Derek Kaufman's house. There, Willis and Connelly enlisted Derek Kaufman's assistance in the plan to murder Bobby Kent.
7. Derek Kaufman portrayed himself as a gang leader. He had the reputation of one who could do, and had previously done, harm to others. He suggested that they (Connelly and Willis) wait to attack Bobby Kent until plans could properly be made, so that the crime could be committed without detection.
8. Kaufman suggested that the proper place to attack Bobby Kent was a remote area of western Broward County (Weston). He claimed that he had previously killed others at this site. This is where Bobby Kent was murdered the next night.
9. Lisa Connelly and Alice Willis did not heed Kaufman's advice. That night, they took Connelly's mother's handgun, concealed it, and drove with Bobby Kent to the remote site where he was ultimately murdered the next night. After their attempt failed, Willis, Connelly and Bobby Kent returned to Kent and Puccio's block. There, in the presence of Martin Puccio, Lisa Connelly, Heather Swallers and Donald Semenec, Bobby Kent walked off hand in hand with Alice Willis to his house. Martin Puccio made the comment that Bobby Kent had to die. Allegedly, Bobby Kent raped Alice Willis that night at his house.
10. The next day, Derek Dzvirko (Lisa Connelly's cousin) was enlisted. He joined Donald Semenec, Derek Kaufman and Martin Puccio in murdering Bobby Kent the next night.
11. On the night of his murder, Bobby Kent was lured to the same remote rock pit area in western Broward County, where he had been the night before with Willis and Connelly. Bobby Kent was there under the belief that Willis and he were rekindling their relationship and to race her new car.
12. Prior to meeting Bobby Kent on the night or his murder, Lisa Connelly, Alice Willis, Donald Semenec, Derek Dzvirko and Heather Swallers picked Derek Kaufman up at his house. On the way to Bobby Kent's and Martin Puccio's block, the group discussed various methods to kill Bobby Kent.
13. Upon arrival at Martin Puccio's house, the group continued to discuss their plan with Martin Puccio present. On this hot summer night, Puccio wore a trench coat. Underneath his coat, he had strapped a divers knife to his leg. He also brought with him a metal pipe. Derek Kaufman hid in the back of Martin Puccio's mother's car so that Bobby Kent, who had not yet arrived, would not know he was present with the others.
14. Between the group's members there were four weapons: two knives, a baseball bat and a lead pipe.
15. Unknown to the victim, there was no intention to race cars and Alice Willis was not desirous of rekindling their relationship. To the contrary, Alice Willis brought along her current boyfriend, Donald Semenec, who was introduced to the victim as "Alex," the alleged boyfriend of co-defendant, Heather Swallers.
16. Together, Willis, the victim, Semenec and Swallers drove for approximately one-half hour to the rock pit. Lisa Connelly, Martin Puccio, Derek Dzvirko and Derek Kaufman (who had hidden himself from Bobby Kent's sight), drove along in a second car.
17. At the rock pit, Alice Willis walked hand in hand with Bobby Kent by the bank of the canal. While she feigned her relationship with him, the other co-conspirators (including Puccio) were making their final preparations prior to commencing the deadly attack.
18. As the prearranged signal was given, Donald Semenec stealthily approached Bobby Kent from behind and stabbed him in the back of the neck. This action commenced the deadly attack of Bobby Kent.
19. The medical examiner, Dr. Daniel Selove, testified that Bobby Kent died as a *862 result of multiple stab wounds. There were two stab wounds to the back of Bobby Kent's neck. One stab wound penetrated the skin one to two inches in depth along the side of the backbone. The other stab wound was located in the back of Bobby Kent's head, scalp deep. There were three superficial stab wounds in the area of Bobby Kent's right shoulder. These wounds did not penetrate more than a half-inch to an inch below the skin. Bobby Kent's right abdomen was slashed open. This wound was two inches wide at the opening and penetrated his body six to seven inches deep. After passing through the skin and muscle at the front of the abdomen, the wound passed through some attachments of the intestine, through the diaphragm and then punctured tissues of the lower back. This eventually caused Bobby Kent's intestine to protrude from his body.
Two defensive wounds were located, one on Bobby Kent's right arm and the other on his left hand.
There were two incised wounds from slicing motions which slit his neck twice. The upper wound was four inches across, while the lower wound was five inches across. The voice box or windpipe was severed as a result. This prevented Bobby Kent from speaking and caused bleeding into the windpipe which obstructed his ability to bring air in and out of his lungs.
Bobby Kent's neck was fractured just inside the cut throat area. Two bones were fractured in the vertebrae column behind the trachea by a force which caused the head to move backward.
Bobby Kent was also stabbed in the left chest. The wound was two inches across and penetrated six to seven inches into his chest. The knife penetrated three of his four heart chambers, continuing through a lung and puncturing the tissue between the ribs and the back of the chest.
There was a two-inch-long laceration of Bobby Kent's right scalp. This injury was inflicted by a blunt instrument. The skull was not fractured.
20. After the first blow was inflicted upon Bobby Kent, he turned to his childhood friend, Martin Puccio, for help. It was at that time that Puccio stabbed him in the abdomen. Wounded, Bobby Kent attempted to flee from his attackers. Kaufman yelled to the others that the victim had to be stopped. Kent was pursued, brought to the ground and surrounded by Semenec, Kaufman and Puccio. The attack, which resulted in the murder of Bobby Kent, then continued.
21. As the attack concluded, Derek Kaufman took the heavily weighted baseball bat and swung it at the prone and almost lifeless body of Bobby Kent. Afterwards, witnesses testified that the noise which had been coming from Kent stopped.
22. Bobby Kent, clinging to life, was thrown into the canal by Martin Puccio and Derek Kaufman and left to die. Afterwards, all the co-conspirators drove away as planned to Hollywood Beach.
In short, the plot to kill Kent was hatched by Alice Willis and Lisa Connelly, and their first recruit was gang leader Derek Kaufman, who had a reputation for violence. Willis and Connelly ignored Kaufman's advice to wait for a carefully constructed plot, and the two women concocted a scheme wherein they would kill Kent that night. The plan flopped, and the next day Derek Dzvirko was enlisted. Prior to the murder that night, Connelly, Willis, Donald Semenec, Dzvirko, Heather Swallers, and Kaufman all discussed various ways to kill Kent as they drove to Puccio's house, where they continued the discussion. When the group proceeded to the rock pit that night with Kent, Puccio carried a knife and a pipe; others carried a second knife and a weighted baseball bat. Semenec struck the initial blow, a knife-wound to Kent's neck. From that point onward, Semenec, Kaufman, and Puccio all participated in the stabbing and beating of Kent. In conclusion, Kaufman bludgeoned Kent with the baseball bat, and then he and Puccio threw the body into the canal.
Nothing in the trial court's findings above indicates that Puccio played a greater role in the planning and killing of Kent than any of the others. In fact, he played a lesser role than others in the planning since he was not present during the initial formulation of the *863 plan or when the group discussed ways to kill Kent on their way to Puccio's house. Puccio also played no greater a role in the actual killing than either Semenec or Kaufmanit was Semenec who initiated the melee with the stab wound to the neck and Kaufman who finished it with the coup de grace with the bat.
The State conceded at trial that Puccio was not a ringleader in the crime. The State's theory was that although Puccio might not have been a leader, he nevertheless was a participant:
There is no justifiable use of deadly force in this particular case. Mr. Puccio may not have been involved with the initial core of conspirators, yes. Perhaps, Lisa Connelly is the casting director for this loosely-knit group. Perhaps, Mr. Kaufman, with the aid of Mr. Kaufman, became the choreographer how this murder is going to take place, that's what we get from Mr. Dzvirko and Ms. Swallers, both at the house and at the scene before they go out there.
In any event, the evidence is clear that at some point he joins this conspiracy. And the evidence is also clear that he's a participant in it and that he, in fact, delivered some of the fatal wounds to Bobby Kent.
We conclude that the trial court's determination that Puccio was more culpable than the others is not supported by competent substantial evidence in the record and is contrary to the State's own theory at trial. Accordingly, we find that Puccio's sentence of death is disproportionate when compared to the sentences of the other equally culpable participants in this crime.[6]See Hazen v. State, 700 So.2d 1207 (Fla. 1997) (reversing death sentence where "two non-triggermen are involved if one of the defendants is a prime instigator and the other is not"); Curtis v. State, 685 So.2d 1234 (Fla.1996) (reversing death sentence where "the actual killer was sentenced to life"); Scott, 604 So.2d at 468-69 (reversing death sentence where the co-perpetrators "were equally culpable participants in the crime"); Slater v. State, 316 So.2d 539, 542 (Fla.1975) (reversing death sentence where "the court that tried the appellant also permitted the `triggerman'... to enter a plea of nolo contendere"). We find the remainder of Puccio's claims to be either moot,[7] not preserved,[8] or without merit.[9]
Based on the foregoing we affirm the convictions and sentences except for the death sentence, which we vacate. We remand for imposition of a life sentence without possibility of parole for twenty-five years on the first degree murder conviction.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Justice, concurring in part and dissenting in part.
I concur in the majority's affirmance of Puccio's conviction of first-degree murder.
I dissent because the record evidence fails to support the majority's assertion that the trial judge's order is not based upon competent, substantial evidence. There is ample evidence to support the trial judge's conclusion. The trial judge merely drew a conclusion from that evidence which is different from that which the majority draws.
The majority does exactly what this Court said in Hudson v. State, 538 So.2d 829 (Fla. 1989), this Court could not do:
[W]hat Hudson really asks is that we reweigh the evidence and come to a different conclusion than did the trial court. It is not within this Court's province to reweigh or reevaluate the evidence presented as to aggravating or mitigating circumstances. Brown v. Wainwright, 392 So.2d 1327 (Fla. 1981). We must, therefore, decline Hudson's invitation to reweigh the mitigating *864 evidence and place greater emphasis on it than the trial court did.
The sentences of other defendants to a criminal episode are mitigating circumstances which the present majority reweighs and reevaluates and then places greater emphasis on than did the trial judge. This clearly exceeds this Court's province. The majority claims that what it does is a proportionality review, but it is actually a reweighing.
I conclude that the majority settles upon proportionality as a basis for reversal, because no other basis exists to reverse the trial judge. However, a review of the cases cited by the majority in support of its proportionality reversal only leads to the conclusion that proportionality is not a justifiable basis either.
There can be no question from the record that the evidence supports the conclusion that appellant did the actual killing of the victim. Thus, the majority is obviously wrong in using Hazen v. State, 700 So.2d 1207 (Fla. 1997), as support for a reversal on the basis of proportionality since the majority in Hazen specifically relied upon Hazen not doing the actual killing. Curtis v. State, 685 So.2d 1234, 1235 (Fla.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 2521, 138 L.Ed.2d 1022 (1997), is likewise different, in that Curtis was only seventeen years old and did not do the actual killing. Scott v. Dugger, 604 So.2d 465 (Fla.1992), is patently distinguishable because in that case it was the finding of the trial judge that both defendants were equally culpable, whereas here the trial judge found appellant more culpable. Slater v. State, 316 So.2d 539, 542 (Fla. 1975), is factually inapposite, in that this Court's opinion specifically points out that "[t]he record clearly reflects that the defendant-appellant, Slater, was an accomplice and did not have the murder weapon in his hand." Moreover, in Slater, eleven members of the jury recommended a life sentence.
The case which is comparable and which affirmed the trial court's sentence of death against a similar proportionality challenge is Garcia v. State, 492 So.2d 360 (Fla.1986). The majority unfortunately chooses to omit any reference to Garcia.
NOTES
[1] The co-perpetrators were convicted and sentenced as follows: (1) Heather Swallers, second degree murder and conspiracy (seven years imprisonment); (2) Derek Dzvirko, second-degree murder and conspiracy (eleven years imprisonment); (3) Alice Willis, second-degree murder and conspiracy (forty years imprisonment); (4) Donald Semenec, second-degree murder and conspiracy (life and fifteen years imprisonment); (5) Derek Kaufman, first-degree murder and conspiracy (the jury recommended life and he was sentenced to life and thirty years imprisonment); (6) Lisa Connelly, second-degree murder and conspiracy (life and five years imprisonment, which was reversed on appeal and remanded for imposition of a guidelines sentence).
[2] The court found the following aggravating circumstances to be established: The murder was especially heinous, atrocious, or cruel (HAC); and the murder was committed in a cold, calculated, and premeditated manner (CCP).
[3] The court found the following statutory mitigating circumstances to be established: Puccio had no significant prior criminal history; and he was of a young age (twenty years old) at the time of the crime. The court gave each factor little weight.
[4] The court found the following nonstatutory mitigating circumstances to be established: Puccio used drugs and alcohol during his youth; Puccio has some potential for rehabilitation; Puccio was subjected to stress in his life caused by the victim; Puccio is unlikely to endanger others. The court gave each factor little weight.
[5] Puccio claims that the court erred on the following points: (1) equally culpable codefendants; (2) CCP; (3) HAC; (4) proportionality; (5) DOC recommended life; (6) CCP instruction; (7) refusing to instruct on extreme duress or substantial domination; (8) allowing the prosecutor to question Dr. Day about Puccio's statements; (9) failing to consider life as an option; (10) allowing Puccio to call a witness without a Faretta hearing; (11) presumption of death; (12) HAC instruction; (13) requirement of "extreme" mental disturbance; (14) defining nonstatutory mitigating circumstances; (15) hearsay statements of Kaufman; (16) Kaufman's statements to Colletti; (17) comment on post-arrest silence; (18) Lemke's testimony concerning "Marty"; (19) reasonable doubt instruction; (20) newly discovered evidence.
[6] See supra note 1.
[7] Issues 2, 3, and 5-14 are moot.
[8] Issues 15 and 19 were not preserved.
[9] Issues 16, 17, 18 and 20 are without merit.