# Supreme Court of Florida

_____

No. SC12-2103

_____

**ROBERT PERNELL McCLOUD,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 17, 2016]

PER CURIAM.

This case is before the Court on appeal from a judgment of convictions of first-degree murder and sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the convictions but reduce the sentences to life imprisonment.

## STATEMENT OF THE CASE & FACTS

Robert McCloud appeals his convictions and sentences for the first-degree murders of Dustin Freeman and Tamiqua Taylor. During the afternoon of October 3, 2009, McCloud and Andre Brown were driving around the Malibu neighborhood of Orlando, Florida, when they ran into Joshua Bryson. The three

visited Major Griffin at his house, where a series of discussions about "hitting a lick" or robbing known drug dealer, Wilkins Merilan, began. Griffin and Bryson robbed Merilan on Father's Day of the same year and believed he held back large quantities of drugs and cash during that encounter. Jamal Brown (not related to Andre Brown) later joined the group, and the discussions culminated in a plot to burglarize Merilan's house in Poinciana, Florida, while Merilan was visiting Orlando.

That evening, before leaving Orlando, the men equipped themselves with various firearms, including a .38 caliber revolver, a .40 or .45 caliber semiautomatic, and a 9 millimeter semiautomatic. They then traveled to Poinciana in two vehicles and, upon reaching Merilan's neighborhood between 10 and 11 p.m., drove down his cul-de-sac to surveil his house. The group then drove to the local Walmart and parked there to further discuss their plan. They may have made a second trip to Merilan's house and back to Walmart. After traveling back to the neighborhood just past midnight, Bryson positioned himself in his vehicle somewhere in close proximity to Merilan's street, while the others positioned themselves in Merilan's backyard. The group realized that Merilan in fact was home and also that a party was underway at an adjacent house. This caused them to pause and wait for about three hours while refining their plan.

The group eventually decided to move forward with robbing Merilan. The physical evidence shows that the front door was kicked in and shots were simultaneously fired toward the master bedroom. Merilan was immediately subdued, bound by his wrists and ankles, and placed on the master bedroom floor. Taylor, Merilan's girlfriend who was living with him, was in the master bedroom. She was ordered to take Merilan's three-year-old daughter, who was spending the weekend with Merilan, and sit on the living room couch. Freeman, Merilan's friend who was visiting from Miami, was in the guest bedroom and was also bound and placed on the master bedroom floor.

The group ransacked the house, collecting about $4,000 to $5,000 in cash, $10,000 worth of marijuana, a .38 caliber revolver, and possibly a small quantity of cocaine. Believing more was in the house, they turned their attention to Merilan and began demanding the whereabouts of the rest of his drugs and cash. While still tied up and laying on the floor, Merilan was kicked and had a forty-pound dumbbell dropped on his head. His arms were sliced with a steak knife. Merilan also had boiling water laced with bleach poured on his back; the water seeped into the carpet and scalded his thighs, stomach, and groin area. He indicated that the drugs and money were in the tires of his Hummer vehicle in hopes that a pedestrian would see the cohorts or that the vehicle's alarm would activate. It was about that time that Bryson was summoned to the house.

While somewhat conflicting, the evidence generally shows that Merilan was either placed in the master bedroom closet or broke his restrains and ran into it. A series of loud and soft sounding gunshots subsequently rang out with multiple shots being fired at the closet, where Merilan was sitting with his back against the door. The shootings resulted in Merilan being shot several times, including in the stomach, testicle, and thigh. Freeman and Taylor were shot in the back of the head at close range while on the master bedroom floor and living room couch, respectively. The group subsequently fled the Poinciana area in their vehicles and rendezvoused back in Orlando, where they divided up the drugs and cash. McCloud took the stolen firearm.

In investigating the crimes, the Polk County Sheriff's Office (PCSO) focused on Bryson as a suspect after detecting his fingerprint in the back compartment of Merilan's vehicle. Bryson was arrested in Orlando on October 20, 2009. He initially denied his involvement, but after being confronted with the fingerprint evidence, he provided deputies with a statement implicating McCloud, Griffin, Andre, and Jamal as participants in the crimes. Griffin was arrested the following day but did not provide a statement to law enforcement officers. Andre was arrested one week later and Jamal months thereafter; both provided statements concerning the crimes.

McCloud was arrested on October 21, 2009. Orange County Sheriff's Office (OCSO) deputies apprehended McCloud in connection with an outstanding arrest warrant for an unrelated offense and notified Polk County authorities. That evening, PCSO Detective Troy Lung met them in a church parking lot and provided McCloud with his Miranda[1] warnings, after which he agreed to speak with detectives. McCloud was then transported to OCSO facilities, where he was questioned for the next several hours. During the interrogation, McCloud made several admissions to PCSO Detectives James Evans and Consuelo Gallegos-Bias in which he implicated himself in the burglary and robbery but denied harming Merilan, Taylor, and Freeman. Unbeknownst to McCloud, fifty-five minutes of his interview with Gallegos-Bias was video recorded.

McCloud and the other four men were charged by separate indictments, each alleging two counts of first-degree murder, and one count each of attempted first-degree murder, conspiracy to commit burglary, armed robbery, and armed burglary of an occupied dwelling with an assault or battery. Griffin was deemed legally incompetent to stand trial and diagnosed as intellectually disabled; thus, he was statutorily ineligible for the death penalty. Bryson, Andre, and Jamal entered into negotiations with the State and, among other terms, agreed to plead "no contest" to two counts of second-degree murder and testify truthfully in all proceedings

---

1. Miranda v. Arizona, 384 U.S. 436 (1966).

concerning each codefendant. Bryson's agreement also included an imprisonment term of ten years, and Andre's and Jamal's agreements each included fifteen years. Bryson, Andre, and Jamal testified at McCloud's trial, but Jamal insisted on cross-examination that his testimony was false.

McCloud argued throughout the trial proceedings that his video-recorded statement with Detective Gallegos-Bias was involuntary and thus inadmissible because it was elicited through excessively coercive tactics by law enforcement officers. He further denied having any participation in the various crimes and admitted that he only engaged in the earlier stages of the discussions that occurred in Orlando on the afternoon of October 3, 2009. Also, McCloud insisted that at the times of the actual robbery, burglary, murders, and attempted murder, he was babysitting a child or children in the Apopka/Maitland area while his wife was in the hospital. He testified and called other witnesses in support of this alibi.

On March 5, 2012, a jury found McCloud guilty on each count charged in his indictment. The jury further determined by special interrogatory that he actually possessed a firearm but did not discharge it during the commission of the crimes. During the penalty phase, the defense presented testimony of several family members, including McCloud's wife, older sister, sister-in-law, and mother-in-law. The defense also presented expert testimony from two psychologists. The jury recommended death sentences for the murder convictions by an eight-to-four

vote, and the trial court sentenced McCloud to death on August 31, 2012.  The trial

court also sentenced McCloud to life imprisonment for attempted first-degree

murder, five years' imprisonment for the conspiracy, life imprisonment with a

minimum mandatory sentence of ten years for the armed burglary, and life

imprisonment with a minimum mandatory sentence of ten years for the armed

robbery.  The trial court ordered that the sentences run concurrently.

In imposing the death sentences, the trial court concluded that the State

proved five statutory aggravating circumstances[2] beyond a reasonable doubt, and

found two statutory mitigating circumstances[3] and sixteen nonstatutory mitigating

circumstances.[4]  The trial court further concluded that "the aggravating

---

2. The statutory aggravators include: (1) prior violent felony based on contemporaneous conviction of another murder (great weight); (2) capital felony was committed while McCloud was engaged in a burglary and/or robbery (great weight); (3) capital felony was committed for the purpose of avoiding arrest (great weight); (4) capital felony was committed for financial gain—which merged with the burglary/robbery felony aggravator; and (5) capital felony was a homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (substantial weight).

3. The statutory mitigators include emotional and developmental age, and McCloud was under the influence of extreme mental or emotional disturbance. Both were accorded slight weight.

4. The nonstatutory mitigators include: (1) learning disabilities (slight weight); (2) psychological impact of being physically abused as a child (some weight); (3) psychological effect of neglect as a child (some weight); (4) psychological and life altering effects of school and other institutional failures (little weight); (5) level of emotional maturity (slight weight); (6) borderline level of intellectual functioning (some weight); (7) McCloud promoted a positive family

circumstances far outweigh[ed] the mitigating circumstances." This appeal

follows.

## ANALYSIS

### Motion to Suppress

McCloud contends that the trial court erred by denying his motion to

suppress his confession and the corresponding video recording of it. In <u>Jackson v.

State</u>, 18 So. 3d 1016 (Fla. 2009), we explained the standard for reviewing rulings

on motions to suppress:

> "A trial court's ruling on a motion to suppress comes to the
> appellate court clothed with a presumption of correctness and the
> court must interpret the evidence and reasonable inferences and
> deductions derived therefrom in a manner most favorable to
> sustaining the trial court's ruling." <u>Rolling v. State</u>, 695 So. 2d 278,
> 291 (Fla. 1997) (citing <u>McNamara v. State</u>, 357 So. 2d 410, 412 (Fla.
> 1978)). In reviewing a trial court's ruling on a suppression motion,
> this Court conducts a two-step analysis in which we determine
> whether (1) competent, substantial evidence supports the trial court's
> findings of historical fact; and (2) the trial court reached the correct
> legal conclusion. <u>See</u> <u>Thomas v. State</u>, 894 So. 2d 126, 136 (Fla.
> 2004) (citing <u>Connor v. State</u>, 803 So. 2d 598, 608 (Fla. 2001)).

---

life for his own family members (slight weight); (8) gainful employment (slight weight); (9) good parent to stepdaughter (slight weight); (10) positive influence on his relatives' minor children (some weight); (11) troubled relationship with natural family (slight weight); (12) raised without a father (slight weight); (13) maintained continued contact with and concern for family (very little weight); (14) suffered a difficult and unstable childhood (some weight); (15) codefendant instigated offense (some weight) and planned it (very little weight); and (16) McCloud never experienced a family life that could be considered normal (some weight).

Id. at 1027-28.  Further, "[a]s long as the trial court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.' "  Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting Demps v. State, 462 So. 2d 1074, 1075 (Fla. 1984)); accord Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007); Parlee v. State, 899 So. 2d 458, 460 (Fla. 5th DCA 2005).  Inasmuch as "a ruling is based on an audio recording [or videotape], the trial court is in no better position to evaluate such evidence than the appellate court, which may review the tape for facts legally sufficient to support the trial court's ruling."  Bailey v. State, 31 So. 3d 809, 812 (Fla. 1st DCA 2009) (quoting Dooley v. State, 743 So. 2d 65, 68 (Fla. 4th DCA 1999)).

Invocation of the Right to Remain Silent

McCloud specifically challenges the admissibility of the statement he provided to PCSO detectives on the ground that he reasserted his Miranda right to remain silent before providing inculpatory information.  The Fifth Amendment to the United States Constitution decrees that "no person shall be . . . compelled in any criminal case to be a witness against oneself."  Accord art. I, § 9, Fla. Const.  Once "a suspect, in any manner, indicates that he or she does not wish to engage in an interrogation with law enforcement, an interrogation must not start, or if it has

begun, must cease immediately." Deviney v. State, 112 So. 3d 57, 74 (Fla. 2013).

However, we employ a different standard where a defendant has been instructed on

but waives his or her Miranda rights.

> [W]here a defendant has received proper Miranda warnings and
> waived his Miranda rights, he must make an unequivocal or
> unambiguous request to terminate an interrogation in order to reassert
> those rights. State v. Owen, 696 So. 2d 715, 719 (Fla. 1997) (citing
> Davis v. United States, 512 U.S. 452, 461 (1994)). If a defendant's
> attempt to revoke his waiver is ambiguous or equivocal, police are not
> required to either cease questioning or to clarify whether the
> defendant's statement was in fact a reassertion of his Miranda rights.
> Id. A revocation "is unambiguous if a reasonable police officer under
> the circumstances would understand that the suspect is invoking the
> right." Womack v. State, 42 So. 3d 878, 883 (Fla. 4th DCA 2010).
> When determining whether a revocation is unambiguous, we consider
> "whether the response refers to specific questions about the crime or
> about the underlying right to cut off all questioning." Id. (citing
> Cuervo v. State, 967 So. 2d 155, 163 (Fla. 2007)).

Braddy v. State, 111 So. 3d 810, 830 (Fla. 2012). Still, "context is generally as

important, if not more important, than the exact words a suspect uses in a statement

that is alleged to be an invocation of the right to remain silent." Bailey, 31 So. 3d

at 814-15.

Here, it is undisputed that after his arrest but before interrogation, McCloud

was properly instructed of his Miranda rights but agreed to speak with PCSO

detectives at the OCSO. We therefore conclude that McCloud initially waived his

right to remain silent. Hence, the only relevant inquiry is whether he

unambiguously revoked that waiver. McCloud chiefly highlights his interview

- 10 -

with PCSO Detective James Evans for support that "he unequivocally invoked his right to remain silent and law enforcement did not scrupulously honor his request." We disagree.

In reviewing Evans' testimony in its entirety, it appears that any indication that McCloud no longer wished to speak or refused to divulge further information was in direct response to questions about the extent of his role in the robbery aspect of the crimes. In fact, immediately before these questions were asked, McCloud had already disclosed the shooter's identity (Griffin, according to McCloud) and requested that Evans inform Andre that he did not implicate the others as the shooter. As such, we are not convinced that McCloud's statements to Evans show anything more than a declination to answer questions about a specific aspect of all of the crimes that transpired on the night in question.

This observation is bolstered by McCloud's subsequent interactions with Consuelo Gallegos-Bias, the third and final detective to interview McCloud. Gallegos-Bias testified that McCloud initiated the interview with her by asking if she had any questions. She also testified that McCloud admitted that he lied to the first two interrogating detectives, but assured her that he would tell the truth and that she could relay the information to the others. The video recording of McCloud's confession depicts this precise agreement between the two. And, Lieutenant Louis Giampavolo testified at trial that it is not atypical for a suspect to

talk to one detective but not want to speak with another. McCloud's apparent willingness to continue speaking with a particular detective negates any argument that he unambiguously indicated to law enforcement that he wished to terminate all questioning that evening. See Braddy, 111 So. 3d at 831 ("Braddy's multiple requests to speak to one detective but not the other belie his claim that he did not wish to speak to detectives at all.").

For these reasons, McCloud has failed to demonstrate that he unambiguously reasserted his Miranda right to remain silent before providing the statement at issue. Accordingly, we deny relief as to this claim.

### Voluntariness of Confession

McCloud argues that his confession is nevertheless unreliable because it resulted from coercive police tactics, including repeated threats to seek first-degree murder charges and the death penalty and promises not to do so if he cooperated. In evaluating the admissibility of a confession to be used against a defendant at trial, we have instructed that "[t]he test is . . . one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession." Baker v. State, 71 So. 3d 802, 814 (Fla. 2011) (quoting Owen v. State, 862 So. 2d 687, 695 (Fla. 2003); Traylor v. State, 596 So. 2d 957, 964 (Fla. 1992)). "As this Court and the United States Supreme Court have made clear, 'the ultimate issue of voluntariness is a legal rather than factual

question.' " Ross v. State, 45 So. 3d 403, 418 (Fla. 2010) (quoting Ramirez v. State, 739 So. 2d 568, 575 (Fla. 1999)). Specifically, "whether a confession is admissible depends on (1) whether the interrogating officers engaged in coercive activity, and (2) whether that activity was sufficient to overcome the free will of the defendant." Baker, 71 So. 3d at 814; see generally Colorado v. Connelly, 479 U.S. 157 (1986). When assessing the totality of the circumstances, courts have considered numerous factors, including but not limited to: (1) the location of the interrogation, see Drake v. State, 441 So. 2d 1079, 1081 (Fla. 1983); (2) whether the confession was elicited by a direct or implied promise of leniency, see Bruno v. State, 574 So. 2d 76, 79-80 (Fla. 1991); (3) "the defendant's prior experience with police . . . as well as . . . police brutality, and whether the defendant was deprived of food or water or sleep," Green v. State, 878 So. 2d 382, 383 (Fla. 1st DCA 2003); and (4) whether the defendant initiated contact with law enforcement officials, see Michigan v. Harvey, 494 U.S. 344, 356 (1990). The State bears the burden of demonstrating by a preponderance of evidence that a confession was freely and voluntarily given. Cuervo, 967 So. 2d at 160 (citing Davis v. State, 859 So. 2d 465, 482 (Fla. 2003)).

In this case, the evidence presented by the State and defense at the suppression hearing is directly conflicting. McCloud's testimony was the only evidence adduced by the defense to prove that his interrogation was interlaced with

improper threats and promises about first-degree murder charges and the death penalty. McCloud testified that Giampavolo and Evans of the PCSO repeatedly exclaimed in a combative manner that he would get "the needle." McCloud also testified that Giampavolo insinuated that McCloud was guilty because a gun— which, at the time, was suspected of being the murder weapon—was found on him when he was arrested. Finally, McCloud testified that Gallegos-Bias assured him that he would not be charged with murder and subjected to the death penalty if he cooperated.

In stark contrast, Giampavolo, Evans, and Gallegos-Bias, as well as PCSO Detective Lung expressly testified that no threats or promises were made to McCloud during their respective interactions with him. Each officer also denied observing such activity by other law enforcement personnel. Based on our independent review of McCloud's video-recorded statement, we have detected no apparent signs in McCloud's demeanor or interaction with Gallegos-Bias indicating that he was threatened in any way. "We have, in the past, upheld the admission of confessions in situations where the defendant's testimony was inconsistent with the testimony of every other witness at the suppression hearing." Johnson v. State, 696 So. 2d 326, 330 (Fla. 1997) (citing Maqueira v. State, 588 So. 2d 221, 223 (Fla. 1991); McDole v. State, 283 So. 2d 553, 554 (Fla. 1973)); see also Hall v. State, 107 So. 3d 262, 272 (Fla. 2012) (holding that the State

proved voluntariness of confession by a preponderance of evidence where defendant alleged he was beaten by correctional officers while being detained after victim's murder—all twelve State witnesses testified during suppression hearing that defendant was never threatened or physically abused during detainment; defendant was the sole witness presented by defense to contradict State's witnesses; he was arrested without incident; and video recording revealed no obvious signs of abuse or injury).

Moreover, the evidence supports the conclusion that McCloud's confession resulted from his own realization that the attendant circumstances were heavily stacked against him. Prior to McCloud's arrest, codefendant Bryson provided a statement to deputies in which he implicated himself, McCloud, and the other codefendants. As previously noted, the OCSO officers who arrested McCloud found a gun on him—which McCloud knew was stolen from Merilan's house on the night of the crimes—and believed it to be connected with the murders of Freeman and Taylor. The video recording of McCloud's statement depicts him uttering as an aside, "I done admitted to being in the house so that f***ed me up off rip. That's conspiracy." He later commented that he "just f***ed up," which, according to Gallegos-Bias' testimony, meant McCloud realized he should not have made inculpatory admissions. Also, Evans testified that McCloud pleaded for him to inform codefendants Andre and Jamal that McCloud had confessed only to

Griffin being the shooter, presumably to curry favor if they testified at trial. Finally, the record reflects that McCloud was a five-time convicted felon at the time of the interrogation in question, and thus likely understood that a first-degree murder conviction carried severe penalties, including potentially a death sentence.

Given this evidence, McCloud certainly would have known it was in his best interest to provide his version of the criminal events in order to minimize his culpability. Indeed, the record also reflects that Detectives Evans and Gallegos-Bias encouraged McCloud to do so during their respective interviews with him. Merely "[e]ncouraging or requesting a person to tell the truth does not result in an involuntary confession." Reeves v. State, 67 So. 3d 380, 386 (Fla. 4th DCA 2011) (citation omitted).

McCloud maintains that detectives purposely did not record the interrogation segments during which the alleged misconduct occurred. The record is devoid of legally sufficient evidence supporting this accusation. First, OCSO Corporal Duana Pelton explained that when a guest agency requests to utilize the OCSO's interrogation facility, OSCO personnel would maintain control of the monitoring system's operations, including the recording function. Pelton further explained that the OCSO adopted an informal policy of recording all interrogations in their entirety to safeguard against potential accusations of witness and defendant abuse. Pelton testified that because she was not present at the OCSO during McCloud's

interrogation, she was relying on her subordinate's report regarding the events surrounding the interrogation to aid her in her testimony. Pelton admitted that the report did not indicate to what extent, if any, McCloud's interrogation was recorded. And, her subordinate was unavailable to testify at the suppression hearing and trial.

Also, Giampavolo explained the circumstances surrounding his decision to instruct Gallegos-Bias to record McCloud's confession:

> Q: In the Polk County Sheriff's Office homicide division in 2009, was it your practice if you were at your own facility to always record every minute of anytime a suspect's in a room?
> A: No.
> Q: You said that you recall instructing someone at some point to record Mr. McCloud. What types of things do you consider as a supervisor in telling someone to turn a recorder on?
> A: It was brought to my attention that Mr. McCloud went through a statement with Detective Bias and she was gonna get a recorded statement on a digital recorder and Mr. McCloud did not want to give the statement on a digital recorder. So at that point when I was made aware of that, I instructed someone to turn the audio on and, you know, the video and record that interview.

Giampavolo added:

> Q: Lieutenant Giampavolo, if as a supervisor you're aware that a suspect is denying his involvement in what you suspect him to be involved in and continues to deny it, do you typically record that?
> A: No.
> Q: If a suspect starts making inculpatory or incriminating statements saying that he was involved in a crime, do you typically direct that those statements be recorded?
> A: Yes.
> Q: Was it your understanding when you were told this about Detective Bias that Mr. McCloud had changed from denial to

admission and that's why Detective Bias wanted to record his statement?

> A: Yes, sir.
> Q: And so you wanted to capture it?
> A: Yes, sir.

Giampavolo further recalled handling other tasks while supervising the interviews associated with McCloud's investigation, including the interview of McCloud's wife. Consequently, Giampavolo was unaware that McCloud was providing incriminating information during Evans' interview. Accordingly, Giampavolo did not instruct anyone to record it and did not instruct Evans to walk McCloud through his admissions again for purposes of recording them. Finally, Evans and Gallegos-Bias testified that they were unaware of the monitoring system's recording feature until after they had completed their interviews.

It is evident that the dominant purpose of the officers' decisions against recording McCloud's entire interrogation was not to conceal any improper conduct but instead to document only admissions pertinent to the investigation. Moreover, there is no indication in the record of collusion between the law enforcement agencies. In fact, the OCSO's foolproof recording policy was intended to prevent the very accusations that McCloud now asserts in this case. Therefore, any notion that the host agency, OCSO, would have exposed itself to said accusations by knowingly sanctioning the less-stringent recording policy that the visiting agency, PCSO, employed for McCloud's interrogation is dubious. The failure to record the

interrogation in its entirety appears to have been attributable to the OCSO's negligence, rather than the misconduct McCloud has alleged against the PCSO.

On balance, we are not left with a definite and firm conviction that the trial court erred in finding that McCloud's confession was given voluntarily and free of threats or coercion. See Smith v. State, 59 So. 3d 1107, 1121 (Fla. 2011). Accordingly, relief is denied as to this claim.

**False-Confession Expert Testimony**

McCloud also argues that the trial court erred by precluding Dr. William Kremper from testifying that his statement to law enforcement was coerced. We review a trial judge's decision to exclude expert witness testimony for an abuse of discretion. Parker v. State, 89 So. 3d 844, 870 (Fla. 2011); McWatters v. State, 36 So. 3d 613, 629 (Fla. 2010). This standard is met if "the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court." Lynch v. State, 2 So. 3d 47, 80 (Fla. 2008) (citations omitted).

Citing Boyer v. State, 825 So. 2d 418 (Fla. 1st DCA 2002), McCloud specifically asserts that the jury was entitled to hear Dr. Kremper's testimony about the phenomena of false confessions, how to recognize them, and how, based on diagnostic testing, McCloud's statement was involuntary. We agree, but find the error harmless.

False confessions are not commonly understood, so a false confession expert can play an important role in explaining to the jury that "a phenomenon that causes innocent people to confess to a criminal offense" exists, and "the parameters within which one can evaluate a confession to determine its veracity." Id. at 419. In fact, we have previously found the testimony of a false-confession expert as grounds for reversing for a new trial after concluding, based on the totality of the circumstances, that the defendant's confession was not voluntary. Ross, 45 So. 3d at 435. As we discussed in that case, defendant Ross's false confession expert

> explained the factors that increase likelihood of false confessions, many of which were present in Ross's case, such as increasing the pressure, exaggerating evidence, challenging a person's memory, continuing an interrogation for a lengthy amount of time, showing photographs of the crime scene, and using isolation. The very fact that Ross confessed that he might have taken his mother's jewelry when in fact the evidence reveals that Kathleen Ross herself had actually taken the jewelry from her house and placed it in her mother's house highlights this danger.

Id. at 433.

In this case, Dr. Kremper's testimony would have regarded the "phenomena of false confessions, how to recognize them, and how, based on diagnostic testing, McCloud's confession was involuntary." Expert testimony concerning false confessions is particularly important because we know that false confessions are one of the leading causes of subsequent findings of innocence, just like unreliable

eyewitness testimony.  <u>See</u> Florida Innocence Commission, <u>Final Report to the</u> <u>Supreme Court of Florida</u> 26 (2012).

Further, Dr. Kremper's proffered testimony did not just concern the general factors that would lead to a false confession.  Rather, he also explained the results of several diagnostic evaluations he conducted on McCloud, including that McCloud's verbal intellectual abilities fell within the borderline range; that his verbal memory as it relates to narrative information was "very, very poor"; that he had a tendency to add details to stories that were not told as parts of the original narrative; and that these and other tests would indicate that McCloud was susceptible to suggestion and compliance.  Certainly this part of Dr. Kremper's testimony showing that McCloud was vulnerable to being induced to falsely confess to a crime requires specialized knowledge and should not have been excluded.

However, the improper exclusion of McCloud's false confession expert testimony was harmless beyond a reasonable doubt.  In the instant case, McCloud not only attacked the reliability of his confession, but also proffered an alibi at trial.  Namely, McCloud insisted that, at all relevant times, he was babysitting at his father-in-law's house an hour away from the crime scene while his wife was in the hospital.  McCloud presented the testimony of several witnesses to corroborate this alibi.  The State presented conflicting evidence, including video surveillance

- 21 -

and direct testimony from at least two codefendants, that placed McCloud in Poinciana as well as at Merilan's residence at all relevant times. Further, as elaborated below, the codefendants' testimonies generally establish that McCloud participated in the planning and execution of the home invasion. This evidence is consistent with McCloud's confession, as well as his concession during trial that earlier on the day in question, that he agreed to burglarize Merilan's house. Moreover, as discussed above, other evidence supports the rejection of McCloud's accusations that he was threatened with first-degree murder charges and the death penalty and made quid pro quo promises during his interrogation.

The above reasons support the conclusion that the trial court did not abuse its discretion by excluding Dr. Kremper's testimony. Accordingly, we deny relief as to this claim.

## Caldwell Claim

McCloud claims that the trial court erred by "advis[ing] the jury on five or six occasions that the ultimate decision to impose the death penalty rested with the court," in violation of the United States Supreme Court's holding in Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the

defendant's death rests elsewhere."). We decline to address this argument in light of our decision to vacate McCloud's death sentences on other grounds.

**Jury's Request for Confession Transcripts**

McCloud argues that error was committed when, in response to the jury's request to review transcripts of his and codefendant Andre's confessions, the trial judge informed the jury that there were no written transcripts but did not advise that the requested portions of the confessions could be read back by the court reporter under Florida Rule of Criminal Procedure 3.410. See Hazuri v. State, 91 So. 3d 836, 840 (Fla. 2012); State v. Barrow, 91 So. 3d 826, 834 (Fla. 2012). We generally review a trial court's decision whether to allow a read-back of requested testimony for an abuse of discretion. See Hazuri, 91 So. 3d at 841 ("[T]rial courts have wide discretion in determining whether to grant read-back requests."); Francis v. State, 808 So. 2d 110, 130 (Fla. 2001). However, where, as in this case, no contemporaneous objection was made against an alleged error at trial, the error is unpreserved and thus must be fundamental in nature to be considered on appeal. See Jaimes v. State, 51 So. 3d 445, 448 (Fla. 2010). An error is fundamental if it "reaches down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error." Davis v. State, 136 So. 3d 1169, 1202 (Fla. 2014) (citation omitted).

In this case, any error that may have occurred in failing to provide a read-back of McCloud's confession was not fundamental in nature. The record reflects that the trial court provided video equipment in the deliberation room for the jury to review McCloud's video-recorded interview with Detective Gallegos-Bias. It is difficult to imagine that the video would not have been able to fulfill whatever purposes a read-back or corresponding transcript of McCloud's statement would have served. In fact, we believe that the video would have better aided the jurors in their deliberation and evaluation of whether the statement was coerced—especially by effectively conveying tone, body language, fatigue, and the like. As such, McCloud has failed to show that his guilty verdict could not have been obtained without the omission of a read-back of his confession.

McCloud likewise has not demonstrated fundamental error as to a read-back of Andre's confession. Foremost, unlike McCloud's confession, there is no indication in the record that Andre's confession was used by either party during any of the trial proceedings. In other words, the out of court statement was not received in the course of trial and subject to the adversarial process. See Russ v. State, 95 So. 2d 594, 600 (Fla. 1957) (prohibiting jurors from receiving or adjudicating one's guilt based on evidence independent of that properly received in the course of trial); see also State ex rel. Pryor v. Smith, 239 So. 2d 85, 86 (Fla. 1st DCA 1970) ("The entry into the jury room of the unadmitted evidence amounted to

- 24 -

an impermissible intrusion of the jury's deliberative process in violation of the rule announced by the Supreme Court in State ex rel. Larkins v. Lewis, 54 So. 2d 199 (Fla. 1951).").

Even assuming the jury wished to review Andre's trial testimony, the jury ultimately found that McCloud merely possessed a firearm but did not discharge it during the commission of the crimes—indicating that he was not found to be a shooter. To the contrary, Andre testified that McCloud simultaneously kicked in the door of Merilan's house and fired two shots from his firearm. Andre also testified that he saw McCloud shoot Taylor. Additionally, codefendant Bryson testified that he and Andre encountered one another in prison and that Andre said he shot Freeman and wanted Bryson to testify at McCloud's trial that McCloud shot Taylor. Given that this evidence attributes more culpability to McCloud as a shooter than what the jury verdict actually reflects, it would have bolstered McCloud's guilt. As such, a read-back of Andre's testimony would not have further assisted the jury in reaching its conclusions.

For these reasons, McCloud cannot show that the trial court's failure to advise the jury that the requested confessions could be read back reached down into the validity of the trial. See Davis, 136 So. 3d at 1202. Accordingly, we deny relief as to this claim.

**Attempted First-Degree Murder Jury Instruction**

McCloud insists that there clearly was a dispute as to whether he actually committed some act with intent to cause Merilan's death or whether he acted with premeditated design. As such, McCloud submits that it was fundamental error for the trial court to provide Florida Standard Jury Instruction 5.1 (Attempt to Commit Crime) and to merely insert the words "first degree murder," because that instruction, as altered, still omitted an essential element of the crime charged, to wit: a premeditated intent to kill.

This Court has repeatedly held that "omitting from the instructions a necessary element of the crime 'over which the record reflects there was no dispute' is not fundamental error." Battle v. State, 911 So. 2d 85, 89 (Fla. 2005) (quoting State v. Delva, 575 So. 2d 643, 645 (Fla. 1991)). In Battle, a certified conflict case, Battle was convicted for attempted felony murder with a firearm pursuant to section 782.051(1), Florida Statutes (1999). Id. at 86. He argued that the applicable jury instruction constituted fundamental error because it failed to instruct the jury on the essential element: "that [was] not an essential element of the felony," as required under section 782.051. Id. at 87. This Court held that "a dispute does not arise when mistaken identity is the sole defense and the facts of the crime are conceded by the defendant." Id. at 89. We found that Battle did not dispute the facts of the shooting; rather, "his only defense was that he was

- 26 -

intentionally misidentified by the witnesses in order to protect another individual." Id. at 90. As such, we concluded that the omission of the essential element from the attempted felony murder instruction did not constitute a fundamental error. Id.

Here, McCloud conceded that he, in fact, conspired to burglarize Merilan's house and also conceded that the evidence showed that the burglary, robbery, murders, and attempted murder in question did occur. However, McCloud filed a notice of alibi, arguing that he did not actually participate in the crimes because he was not present at the Poinciana crime scene at any relevant time. Instead, he alleged that he had been babysitting at his father-in-law's Maitland house while his wife was in the hospital. The record reflects that McCloud emphasized this alibi in various regards: he elicited alibi-witness testimony showing his whereabouts at the time of the crimes; he testified on his own behalf as to the same; defense counsel vigorously cross-examined other codefendants about their involvements and plea deals, which ultimately led to Jamal admitting that his testimony inculpating McCloud was untruthful; and counsel also highlighted during closing arguments that no physical evidence tied McCloud to Merilan's house, but that the codefendants had personal motives of placing him at the crime scene with the murder weapon. In addition, McCloud argued at various points of the trial that his video-recorded confession was unreliable because it was the product of coercive interrogation tactics.

These circumstances are reminiscent of those addressed in <u>Battle</u>. Both defendants conceded that the crimes, as charged, had occurred. Battle, by asserting the affirmative defense of misidentification, essentially proffered a similar trial defense as McCloud: because he was not at the crime scene, he could not have committed the crimes. Thus, McCloud's premeditation was not a necessary element of the crime over which the record reflects there was a dispute at trial. <u>See id.</u> We therefore conclude that no fundamental error occurred.

Furthermore, the record reflects that during the charging conference, the trial court, State, and defense reviewed the jury instructions to consider modifications. The trial court invited the parties to make additional arguments with respect to the instructions. Although the defense requested the addition of the name "Wilkins Merilan" as the subject victim into the language of the attempted murder instruction, the parties ultimately agreed on the instruction as proposed and altered. Defense counsel otherwise did not voice his desire to insert additional language into the attempted murder instruction or suggest a different instruction altogether. Florida courts have consistently held that "where a trial court has extended counsel an opportunity to cure an error, and counsel fails to take advantage of such an opportunity, the error is considered acquiesced to and does not warrant reversal." <u>Calloway v. State</u>, 37 So. 3d 891, 896-97 (Fla. 1st DCA 2010) (citing <u>Ray v. State</u>, 403 So. 2d 956, 960 (Fla. 1981)). Accordingly, we deny relief as to this claim.

## Sufficiency of the Evidence

Although not contested by McCloud, this Court independently reviews the sufficiency of the evidence supporting the convictions in cases where a death sentence has been imposed. King v. State, 130 So. 3d 676, 689 (Fla. 2013); Fla. R. App. P. 9.142(a)(5). In evaluating the sufficiency of the evidence, the relevant "question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

Both the sentencing court and McCloud characterized the form which the jury used to convey its verdict as a "Special Interrogatory Verdict." However, the forms in the record more closely resemble general verdict forms accompanied by a special interrogatory as to whether McCloud merely possessed a firearm or actually discharged one during the commission of the crimes with which he was charged. See 11B Fla. Pl. & Pr. Forms § 95:88 (Verdict—General form). "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives, as in this case, may be upheld on appeal where the evidence is sufficient to establish either felony murder or [premeditated murder]." Ellerbee v. State, 87 So. 3d 730, 748 (Fla. 2012) (quoting Crain v. State, 894 So. 2d 59, 73 (Fla. 2004)). The record in this case is replete with competent, substantial

evidence supporting first-degree felony murder, which is the unlawful killing of a human being that occurs during the commission of, or while attempting to commit, among other offenses, burglary, robbery, or the murder of another human being. § 782.04(1)(a)2., Fla. Stat. (2009).

The record generally reflects that on October 3, 2009, McCloud, Andre, Bryson, Griffin, and Jamal met in the Malibu neighborhood of Orlando and agreed to "hit a lick" against Merilan, meaning rob him. Bryson and Griffin had robbed Merilan on Father's Day of that same year, and so it was believed that a lot of cash and drugs were going to be found. Bryson testified that the initial plan was to burglarize Merilan's house while he was away. McCloud admitted that he agreed with the others to burglarize Merilan's house because he needed money. Direct testimony reflects that McCloud, Griffin, Andre, and Jamal equipped themselves with several firearms, including a .40 or .45 semiautomatic, a .38 caliber revolver, and a 9 millimeter semiautomatic. They then traveled in two vehicles to Merilan's Poinciana residence, which was about an hour away from Orlando, at around 10 or 11 p.m. Once they arrived in Poinciana, the codefendants drove past Merilan's house and to the local Walmart parking lot, possibly twice, to discuss the details of the intended burglary. Video surveillance and still photographs from the gas station that shared the parking lot with Walmart placed McCloud at the gas station just after 11 p.m. on the evening in question. Bryson confirmed that the

surveillance video and still photographs recorded McCloud on that night; and the testimony of Bryson and Andre, as well as McCloud's confession, placed McCloud in Poinciana and at the crime scene at all relevant times.

The record also shows that the codefendants returned to Merilan's house and positioned themselves in his backyard just after midnight. After observing that Merilan was home and that a party was underway at a neighboring house, the codefendants lay in wait and refined their plan in the backyard for three hours. They eventually kicked in the front door and fired off several gunshots toward the master bedroom. Merilan and Freeman were immediately subdued, bound by their wrists and ankles, and placed on the master bedroom floor. Taylor complied with the codefendants' orders to take Merilan's three-year-old daughter and sit on the couch in the living room. During his confession, McCloud stated that Taylor requested a tampon and that he retrieved one for her from the bathroom. Medical expert testimony indicates that Taylor was menstruating at the time she was killed.

Merilan's entire house was ransacked by the codefendants. For about twenty to thirty minutes, he repeatedly lied about the whereabouts of his money, inciting the cohorts to kick and drop a forty-pound dumbbell on his head, slice his arms with a steak knife, and pour boiling water laced with bleach on his back. At some point, Merilan either broke his restraints and ran into the master bedroom closet or was placed in the closet by one of the codefendants. Multiple gunshots

then rang out, including seven loud shots that hit Merilan in the stomach, testicle, and thigh while he was barricaded in the closet. Merilan testified that after he was shot, he heard two additional gunshots. The codefendants' testimonies generally reflect that these two gunshots had a softer sound than the initial gunshots. Medical evidence shows that Taylor and Freeman each suffered a fatal gunshot wound at close range to the back of the head. Neither had defensive wounds or other signs of resistance. Finally, the record reflects that the codefendants collected and divided up about $4,000 to $5,000 in cash, $10,000 worth of marijuana, a .38 caliber revolver (not the same one found on McCloud when he was arrested), and possibly a small quantity of cocaine.

Based on this evidence, the jury could have found beyond a reasonable doubt that Taylor and Freeman were shot and killed execution style during the commission of a burglary-turned-robbery, in which McCloud agreed to participate. The jury likewise could have found that Taylor was killed during the murder of Freeman, or vice versa, and/or that both Taylor and Freeman were murdered during an attempt to kill Merilan. Because the record sufficiently supports a finding of McCloud's participation in the felony murders, we affirm his first-degree murder convictions.

## Double Jeopardy

McCloud's argument that his convictions for armed robbery and armed burglary violate the prohibition against double jeopardy is a pure question of law and thus subject to de novo review. See Pizzo v. State, 945 So. 2d 1203, 1206 (Fla. 2006). In Pizzo, we explained that "[a] defendant is placed in double jeopardy where based upon the same conduct the defendant is convicted of two offenses, each of which does not require proof of a different element." Id. (citing Blockburger v. United States, 284 U.S. 299, 304 (1932); § 775.021(4), Fla. Stat. (2006)). When this test is met, the conviction for the lesser offense should be reversed and the greater offense affirmed. Id.

The cases McCloud cites for support are uninstructive because each stands for the proposition that contemporaneous convictions for burglary of a dwelling and home invasion robbery (or attempted home invasion robbery) implicate the double jeopardy clause. See, e.g., Mendez v. State, 798 So. 2d 749, 750 (Fla. 5th DCA 2001). The general consensus among the cited decisions is that the latter offense subsumes the former. Id. As the Fifth District explained, "[h]ome invasion robbery is in essence an aggravated form of burglary, because it requires a burglary and robbery." McAllister v. State, 718 So. 2d 917, 918 (Fla. 5th DCA 1998).

In contrast, burglary and robbery both require proof of an element unique to each offense.  The statute governing burglary—armed and unarmed alike—requires the State to prove beyond a reasonable doubt that the defendant actually "[e]nter[ed] a dwelling, a structure, or a conveyance," see § 810.02(1)(b), (2)(a)-(b), Fla. Stat. (2009), whereas a robbery may occur at any location—including within the general public.  Further, to establish robbery, the State must show that money or some other property was taken from another person or from their custody.  See § 812.13(1), (2)(a), Fla. Stat. (2009).  Hence, the robbery statute contemplates the completion of the act of a "taking."  To the contrary, in demonstrating a burglary, it suffices merely that the defendant harbored a criminal "intent to commit an offense" within a dwelling, structure, or conveyance—regardless of whether the underlying offense was actually completed.  Therefore, as a matter of law, double jeopardy is not implicated where, as in this case, the defendant is convicted for armed robbery and armed burglary of an occupied dwelling with an assault or battery.  Accordingly, we deny relief as to this claim.

### Penalty Phase Claims

McCloud raises various issues regarding the penalty phase in his trial, including: (1) improper prosecutorial comments; (2) disproportionality of death sentences based on sentences in other cases, disparate sentencing treatment in this case, and the dictates announced in Tison v. Arizona, 481 U.S. 137 (1987), and

- 34 -

Enmund v. Florida, 458 U.S. 782 (1982); (3) State's failure to prove several aggravators; (4) trial court's erroneous rejection of proffered mitigators; and (5) unconstitutionality of Florida's capital sentencing scheme and corresponding jury instructions. Because the disparate sentencing treatment claim is dispositive, we limit our discussion to that issue.

McCloud argues that his death sentences are disproportionate in light of the term-of-years sentences imposed against his codefendants and his lesser role in the crimes. We agree. This Court generally conducts a qualitative assessment of capital cases to ensure that the death penalty is imposed against the most aggravated and least mitigated first-degree murder convictions. Wade v. State, 41 So. 3d 857, 879 (Fla. 2010) (citing Lebron v. State, 982 So. 2d 649, 668 (Fla. 2008)). However "where more than one defendant is involved, the Court performs an additional analysis of relative culpability guided by the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment." Blake v. State, 972 So. 2d 839, 849 (Fla. 2007) (quoting Brooks v. State, 918 So. 2d 181, 208 (Fla. 2005)). If "the circumstances indicate that the defendant is more culpable than a codefendant, disparate treatment is not impermissible despite the fact the codefendant received a lighter sentence for his participation in the same crime." Gonzalez v. State, 136 So. 3d 1125, 1165 (Fla. 2014) (quoting Brown v. State, 721 So. 2d 274, 282 (Fla. 1998)). But, "[w]hen a

codefendant is equally as culpable [as] or more culpable than the defendant, the disparate treatment of the codefendant may render the defendant's punishment disproportionate." Id. (quoting Sexton v. State, 775 So. 2d 923, 935 (Fla. 2000)). Because a trial court's determination regarding the relative culpabilities of codefendants is a finding of fact, we will not disturb that finding if it is supported by competent, substantial evidence. Id. (quoting Puccio v. State, 701 So. 2d 858, 860 (Fla. 1997)).

We recognize that this Court has generally held that the relative culpability of a codefendant is implicated "only when the codefendant has been found guilty of the same degree of murder." Shere v. Moore, 830 So. 2d 56, 62 (Fla. 2002); accord Brown v. State, 143 So. 3d 392, 406-07 (Fla. 2014); Wade, 41 So. 3d at 868. We now reject this limitation, because we do not see the utility in a blanket rule prohibiting a relative culpability analysis when a codefendant is convicted or pleads guilty to a different degree of murder than the primary defendant. As Justice Anstead wrote over a decade ago, such a rule would do a substantial injustice in cases like the one at bar:

> Due to the uniqueness and the finality of death, this Court addresses the propriety of all death sentences in a proportionality review upon appeal. See Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990). In conducting this review, this Court considers the totality of all the circumstances in a case as compared to other cases in which the death penalty has been imposed, see Robinson v. State, 761 So. 2d 269 (Fla. 1999), thereby providing for uniformity in the application of this sentence. As a corollary to this analysis of comparing the

- 36 -

circumstances of a case in which death had been imposed to others with a similar sentence, the Court also performs an additional analysis of relative culpability in cases where more than one defendant was involved in the commission of the killing.

While the first analysis focuses on the larger universe of death sentences that have been imposed, the latter analysis [hones] in on the smaller universe of the perpetrators and participants in a given capital murder. We explained the principle in Slater v. State, 316 So. 2d 539, 542 (Fla. 1975), when we declared: "We pride ourselves in a system of justice that requires equality before the law. Defendants should not be treated differently upon the same or similar facts." More recently, in Ray v. State, 755 So. 2d 604, 611 (Fla. 2000), this Court again emphasized and reaffirmed the principle that equally culpable codefendants should be treated alike in capital sentencing.

Shere, 830 So. 2d at 64 (Anstead, J., concurring in part and dissenting in part).

When ensuring that our proportionality analysis conforms to these basic principles of capital sentencing, it may be apparent why a codefendant received a life sentence through the entry of a plea agreement with the State. Indeed, one valid reason for such a plea agreement might be the lesser culpability of the codefendant. But the acceptance of a plea agreement does not automatically mean that the codefendant was less culpable. We reject any principle of law that hamstrings this Court's ability to conduct a full proportionality review, including a relative culpability analysis, simply because the State allowed a codefendant to enter a plea to murder that resulted in a life sentence. Here, the relative culpability of the defendant as compared with the codefendant is so clear under the unique

circumstances of this case that his death sentence must be reduced to a life sentence. Where factual findings clearly establish that the less culpable defendant is the only defendant receiving a death sentence, that error must be rectified.

In this case, the jury explicitly determined by special interrogatory that McCloud was not the shooter. We have long recognized "that the less culpable, non-triggerman defendant cannot receive a death sentence when the more culpable, triggerman defendant receives" a lesser sentence. Hazen v. State, 700 So. 2d 1207, 1214 (Fla. 1997) (citing Slater v. State, 316 So. 2d 539, 542 (Fla. 1975)).

In addition to the fact that McCloud was not the shooter, the trial court's determination that he also was not an instigator of the crimes is significant. Competent, substantial evidence and particularly McCloud's confession and Andre's testimony show that Bryson presented the initial idea to "hit a lick" against or rob Merilan. Bryson and Griffin previously robbed Merilan that same year, and so it was believed that a lot of cash and drugs were going to be found. McCloud admitted that he agreed with the others to burglarize Merilan's house because he needed money. He also stated that Griffin indicated that he intended to seriously injure Merilan because Merilan "bucked on" Griffin during the prior robbery. Andre testified that while discussing the initial plan at the Poinciana Walmart, Bryson explained the details for executing the robbery. He added that Bryson stood out because he was the most knowledgeable about Merilan's

residence. Finally, Bryson and Andre testified that Bryson did not possess a gun during the events in question. It is evident that Bryson was a prime instigator of the criminal episode in this case. This Court has held that a non-triggerman defendant like McCloud cannot be sentenced to death where, as in this case, "two non-triggermen are involved[,] . . . one of the defendants is a prime instigator and the other is not."[5] Id. Furthermore, we have also found it significant that the defendant was neither the "ringleader," see Puccio, 701 So. 2d at 863, nor a "dominant player in the crimes," see Ray v. State, 755 So. 2d 604, 612 (Fla. 2000). Nothing in the record before us indicates that McCloud played either of these roles.

On balance, the fact that McCloud's codefendants were convicted of a lesser degree of murder is not dispositive of their relative culpabilities. Rather, the record taken as a whole sufficiently demonstrates that McCloud was, in fact, less culpable than those who escaped the death penalty. We therefore conclude that the term-of-years sentences imposed against McCloud's codefendants preclude McCloud's

---

5. It appears that Griffin also was an instigator. Notwithstanding, we note that the trial court found him to be intellectually disabled, thereby rendering him ineligible for the death penalty under section 921.137, Florida Statutes (2009). As such, the trial court's decision not to sentence Griffin to death would not provide a basis for concluding that McCloud's death sentences are disproportionate. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) (declaring it unconstitutional to execute mentally retarded persons); Henyard v. State, 689 So. 2d 239, 254-55 (Fla. 1996) (holding that defendant's death sentence was not disproportionate to the lesser sentenced received by his codefendant, a minor, because "death was never a valid punishment option for" the codefendant).

death sentences.  See Gonzalez, 136 So. 3d at 1165; see also Ray, 755 So. 2d at 611-12 (reversing death sentence where codefendant possibly was the shooter; much of the evidence pointed to him as the dominant player in the crimes; and he was at least as culpable as defendant given that the evidence showed "[b]oth men actively participated in planning the robbery, in executing the robbery, and in stealing the [getaway] car"); Hazen, 700 So. 2d at 1214-15 (determining non-shooter coperpetrator's life sentence precluded death sentence for Hazen because "the evidence clearly establishe[d] that [the non-shooter coperpetrator] was a prime instigator and was more culpable than Hazen"); Puccio, 701 So. 2d at 863 (holding defendant's death sentence was disproportionate in comparison to sentences imposed against other equally culpable participants in victim's beating death; defendant played lesser role than the others in planning since he was not present during initial formulation of plan or ways to kill victim, and defendant played no greater a role in actual killing than two others who initiated and finished the melee); cf. Craig v. State, 510 So. 2d 857, 860, 870-71 (Fla. 1987) (finding no disparate treatment where codefendant "was allowed to plead guilty to reduced charges and was sentenced to life imprisonment"; evidence demonstrated that defendant was planner and instigator of murders; and even though codefendant was direct perpetrator of the killings, he acted under defendant's domination).

## CONCLUSION

For the reasons set forth above, McCloud's convictions of first-degree murder are affirmed. However, we vacate his sentences of death and remand to the trial court for entry of an order sentencing McCloud to life imprisonment.

It is so ordered.

LABARGA, C.J., and PARIENTE, and PERRY, JJ., concur.
QUINCE, J., concurs in result.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON, J., concurs.
LEWIS, J., dissents.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I concur in the decision to affirm McCloud's convictions, but I dissent from the decision to vacate his death sentences based on the majority's relative culpability analysis. The relative culpability of McCloud as compared to his codefendants is irrelevant here because all of the codefendants were either convicted of a lesser degree of murder or otherwise ineligible for the death penalty. Therefore, I would affirm McCloud's death sentences.

We have previously held that "once a codefendant's culpability has been determined by a jury verdict or a judge's finding of guilt we should abide by that decision, and only when the codefendant has been found guilty of the same degree of murder should the relative culpability aspect of proportionality come into play."

- 41 -

Shere v. Moore, 830 So. 2d 56, 62 (Fla. 2002). "In order to have that same degree of blame or fault the codefendants must, at a minimum, be convicted of the same degree of the crime." Id. at 61. "Moreover, the codefendant should not only be convicted of the same crime but should also be otherwise eligible to receive a death sentence, i.e., be of the requisite age and not [intellectually disabled]." Id. at 62. Thus, as we recently reiterated in Brown v. State, 143 So. 3d 392, 406-07 (Fla. 2014), this Court conducts a relative culpability analysis only in cases in which codefendants are convicted of first-degree murder and not otherwise ineligible for the death penalty.

In Brown, we stated that "by virtue of [Brown's codefendant's] plea and second-degree murder conviction, the relative culpability of [Brown's codefendant] for the murder . . . has already been determined to be less than that of Brown," who was convicted of first-degree murder. 143 So. 3d at 407. In Caballero v. State, 851 So. 2d 655, 663 (Fla. 2003), we similarly concluded that we could not conduct a relative culpability analysis because Caballero's codefendant was convicted of second-degree murder. Although the evidence presented at Caballero's trial showed that it was the codefendant who actually offered to kill and thereafter strangled the victim, we stated that "[i]t is not this Court's role to consider or re-weigh the evidence that led to [the codefendant]'s conviction of a lesser degree of murder than Caballero's." Caballero, 851 So. 2d at 663. Instead,

we found it "decisive that [the codefendant]'s culpability was determined to be less than Caballero's" based on the codefendant's second-degree murder conviction. Id.

In cases in which the only codefendant to receive a death sentence is the only codefendant convicted of first-degree murder, this Court has consistently declined to undertake a relative culpability analysis. We have held that the sentence of a codefendant who was not convicted of first-degree murder is "not relevant to a claim of disparate sentencing." Steinhorst v. Singletary, 638 So. 2d 33, 35 (Fla. 1994). Thus, because McCloud's codefendants who received lesser sentences were convicted of a lesser degree of murder, the trial court was correct that "from a legal point of view," McCloud did not receive disparate treatment. McCloud's convictions for first-degree murder render him more legally culpable than his codefendants.

"Underlying our relative culpability analysis is the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment." Shere, 830 So. 2d at 60. However, "[i]t is the crime for which the defendant is convicted that determines his or her culpability," not the particular facts of the case. Id. at 62. Thus, the principle underlying our relative culpability analysis is inapplicable here; because McCloud was convicted of first-degree murder, he and his codefendants are not "equally culpable" under the law. Nor

were the codefendants subject to "capital sentencing." And McCloud is ineligible to receive punishment equal to the term-of-years sentences received by his codefendants; by virtue of his capital convictions, the only sentencing options available for McCloud are life imprisonment or death. See § 921.141(1), Fla. Stat. (2012) ("Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment . . . .").

Notwithstanding the fact that McCloud was the only codefendant convicted of first-degree murder, the majority proceeds to conduct a relative culpability analysis based on its own assessment of the facts of the case. The reason provided for this departure from our precedent is the majority's view that "the relative culpability of the defendant as compared with the codefendant is so clear under the unique circumstances of this case that his death sentence must be reduced to a life sentence." Majority op. at 37-38. The "circumstances" referenced are based on the majority's conclusions that McCloud was not "the shooter," the "prime instigator," the "ringleader," or "a dominant player." Id. at 38-39. But the majority's analysis is flawed in several respects.

First, the majority improperly made its own factual finding that "McCloud was not the shooter." Id. at 38. Neither the jury nor the trial court made such a finding, and this Court is not in a position to do so. See Carr v. State, 156 So. 3d

1052, 1073 (Fla.) (Pariente J., concurring) ("A determination regarding relative culpability requires factual findings that this Court is not in a position to make in the first instance." (citing <u>Puccio v. State</u>, 701 So. 2d 858, 860 (Fla. 1997))), <u>cert. denied</u>, 136 S. Ct. 55 (2015). The majority's conclusion that McCloud was not the shooter is based on the jury's interrogatory verdict. <u>See</u> majority op. at 25 ("[T]he jury ultimately found that McCloud merely possessed a firearm but did not discharge it during the commission of the crimes—indicating that he was not found to be a shooter."). But the interrogatory verdict cannot be interpreted as an affirmative finding by the jury that McCloud was not a triggerman. Instead, it reflects only the jury's conclusion that the State failed to prove beyond a reasonable doubt that McCloud actually discharged a firearm during the commission of the crimes. It provides no indication as to whether the jury actually concluded that McCloud was in fact not a triggerman rather than that the evidence presented was insufficient to support the conclusion that he was a triggerman beyond and to the exclusion of every reasonable doubt. <u>See</u> <u>State v. McCloud</u>, No. 2009CF-007439-XX (Fla. 10th Cir. Ct. Sept. 4, 2012) (Sentencing Order at 18) ("[T]he jury either concluded that someone else shot Dustin Freeman and Tamiqua Taylor, or that there was insufficient evidence to prove beyond a reasonable doubt that Robert McCloud was the shooter."). Indeed, the majority recognizes that the evidence presented at trial "attributes more culpability to McCloud as a shooter

than what the jury verdict actually reflects." Majority op. at 25. At trial, codefendant Andre Brown testified that he saw McCloud fire two shots upon kicking in the door to Wilkins Merilan's house and that McCloud shot Tamiqua Taylor in the head. It is not the prerogative of this Court to go beyond the verdict form and speculate about additional factual findings the jury may or may not have made in reaching its verdict.

Second, each of the cases cited by the majority in support of its decision to vacate McCloud's death sentences is readily distinguishable from this case and does not actually support the majority's decision. In Gonzalez v. State, 136 So. 3d 1125 (Fla.), cert. denied, 135 S. Ct. 193 (2014), Ray v. State, 755 So. 2d 604 (Fla. 2000), Puccio, 701 So. 2d 858, and Hazen v. State, 700 So. 2d 1207 (Fla. 1997), our relative culpability analyses were undertaken because each case involved codefendants who were also convicted of first-degree murder. Craig v. State, 510 So. 2d 857, 869-70 (Fla. 1987), was a judicial override case in which we upheld Craig's death sentence despite the jury's recommendation of a life sentence and the triggerman codefendant's plea to reduced charges and receipt of a life sentence because there was evidence to show that Craig was the planner and the instigator of the murder and that the codefendant acted under the domination of Craig. In that case, we held that the disparate treatment of the codefendant was not a factor that required the trial court to follow the jury's recommended sentence for the

murder.  Craig, 510 So. 2d at 870-71.  We also concluded that Craig's "legal responsibility for the murder . . . was not secondary to but was fully equal to that of [the codefendant]."  Id. at 870.  Here, McCloud's "legal responsibility" for the murders is greater than that of his codefendants based on his first-degree murder convictions.

Finally, the law is clear that "[i]n instances where the codefendant's lesser sentence was the result of a plea agreement or prosecutorial discretion" claims of disparate sentencing are rejected.  England v. State, 940 So. 2d 389, 406 (Fla. 2006) (quoting Kight v. State, 784 So. 2d 396, 401 (Fla. 2001)); see also Krawczuk v. State, 92 So. 3d 195, 207 (Fla. 2012) (concluding that defendant's disparate sentencing claim was without merit where codefendant's sentence of thirty-five years was the result of plea to second-degree murder); Brown v. State, 473 So. 2d 1260, 1268-69 (Fla. 1985) (concluding that death sentence was proper even though accomplice received disparate prosecutorial and judicial treatment after pleading to second-degree murder in return for life sentence); Melendez v. State, 612 So. 2d 1366, 1368-69 (Fla. 1992) ("Arguments relating to proportionality and disparate treatment are not appropriate . . . where the prosecutor has not charged the alleged accomplice with a capital offense."); Scott v. Dugger, 604 So. 2d 465, 471 (Fla. 1992) ("Prosecutorial discretion in plea bargaining with accomplices is not unconstitutionally impermissible and does not violate the principle of

proportionality." (quoting Garcia v. State, 492 So. 2d 360, 368 (Fla. 1986))).  Each

of McCloud's codefendants who were not otherwise ineligible for the death

penalty entered into agreements with the State in which they received lesser

sentences in exchange for their testimony against McCloud and their pleas of no

contest to the lesser offense of second-degree murder.  But the majority

inexplicably ignores this fact in concluding that "the term-of-years sentences

imposed against McCloud's codefendants preclude McCloud's death sentences."

Majority op. at 39-40.

"[U]nder article II, section 3 of Florida's constitution, 'the decision to charge

and prosecute is an executive responsibility, and the state attorney has complete

discretion in deciding whether and how to prosecute.' " Wade v. State, 41 So. 3d

857, 875 (Fla. 2010) (quoting State v. Bloom, 497 So. 2d 2, 3 (Fla. 1986)).  "We

have emphasized that 'the judiciary has authority to curb pretrial prosecutorial

discretion "only in those instances where impermissible motives may be attributed

to the prosecution, such as bad faith, race, religion, or a desire to prevent the

exercise of the defendant's constitutional rights." ' " Id. (quoting State v. Donner,

500 So. 2d 532, 533 (Fla. 1987)).  Nonetheless, with this decision, the majority has

stripped Florida's state attorneys of their discretion to waive the death penalty for

certain defendants without also foregoing the death penalty for other codefendants

who might later be viewed by this Court as either equally culpable or less culpable

- 48 -

on the face of the appellate record. Prosecutors are privy to information about the facts and players involved in a case beyond that which is contained in the record on appeal, and this Court should not place "the State in the untenable Catch-22 of either not obtaining a conviction or of doing what is determined by the state attorney to be necessary to obtain the conviction of the defendant but thereby insulating the defendant from the death penalty." Hazen, 700 So. 2d at 1216 (Wells, J., concurring in part and dissenting in part). For these reasons, I conclude that the majority inappropriately applied a relative culpability analysis here.[6]

McCloud also asserts that he is entitled to relief from his death sentences under Ring v. Arizona, 536 U.S. 584 (2002), and Hurst v. Florida, 136 S. Ct. 616 (2016). As I explained in my dissent in Hurst v. State, the only flaw identified by the Supreme Court that rendered Florida's former death penalty statute

_____

6. I previously expressed my view that comparative proportionality review by this Court is precluded by the conformity clause in article I, section 17 of the Florida Constitution, which requires this Court to interpret our state constitutional prohibition on cruel or unusual punishment in conformity with the decisions of the United States Supreme Court interpreting the parallel provision of the United States Constitution. Yacob v. State, 136 So. 3d 539, 557-63 (Fla. 2014) (Canady, J., concurring in part and dissenting in part). Because relative culpability is an aspect of our comparative proportionality review, I would conclude, for the same reasons detailed in Yacob, that it too is precluded by the conformity clause. But because my view on the subject was expressly rejected by the majority in Yacob and because I have stated that "[u]ntil the State presents an argument justifying receding from our precedent on the subject that was clearly established in Yacob, I will follow that precedent," Delgado v. State, 162 So. 3d 971, 983 (Fla. 2015) (Canady, J., concurring), I therefore do not rely on my view of the conformity clause to reach the conclusion that McCloud's sentences should be affirmed.

unconstitutional was its failure to require a jury finding of an aggravating circumstance. See Hurst v. State, No. SC12-1947, 2016 WL 6036978, at *32 (Fla. Oct. 14, 2016) (Canady, J., dissenting) (noting "the Hurst v. Florida Court's repeated identification of Florida's failure to require a jury finding of an aggravator as the flaw that renders Florida's death penalty law unconstitutional"); see also Hurst v. Florida, 136 S. Ct. at 624 ("Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional."). But McCloud's jury did make findings as to the existence of two aggravating circumstances: (1) that McCloud was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person, based on the contemporaneous murder of the other victim, and (2) that the capital felony was committed while McCloud was engaged in the commission of a burglary and/or a robbery. The jury unanimously determined that both of these aggravating circumstances were proven beyond a reasonable doubt as reflected in their separate verdicts finding McCloud guilty of the contemporaneous first-degree murder of the other victim and the armed robbery and armed burglary during which the murders occurred. Thus, McCloud is not entitled to relief under Hurst v. Florida or Ring.

The other penalty-phase issues raised by McCloud are without merit. Accordingly, I would affirm McCloud's death sentences.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Polk County,
    Donald G. Jacobsen, Chief Judge - Case No. 532009CF0074390000XX

Ita M. Neymotin, Regional Counsel, and Byron P. Hileman, Jr., John Andrew Crawford, and Joseph Thye Sexton, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Candance M. Sabella, Chief Assistant Attorney General, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

    for Appellee